420 S.E.2d 557

**Ronald DAVIS, Executor of the Estate of Jennings Davis, Appellee,**

v.

**The CELOTEX CORPORATION, Appellant.**

**No. 20651.**

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1992.

Decided June 12, 1992.

Rehearing Denied July 21, 1992.

Scott Segal, Hostler & Segal, Charleston, and Theodore Goldberg and Tybe A. Brett, Henderson & Goldberg, Pittsburgh, Pa., for appellee.

Kathleen S. McAllister, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., for appellant.

MILLER, Justice:

The Celotex Corporation appeals a final order of the Circuit Court of Monongalia County, which entered a judgment on a jury verdict awarding Ronald Davis, as executor of the estate of Jennings Davis, $66,000 in compensatory damages and $40,000 in punitive damages because of the asbestos-related death of his father. Celotex contends that the trial court erred in permitting the award of punitive damages against it because: (1) there was insufficient evidence presented at trial that Celotex acted willfully, wantonly, or with malice; (2) punitive damages should not be imposed on a successor corporation based upon the conduct of a predecessor company; (3) multiple punitive damage awards should not be assessed against a manufacturer who mass-markets a defective product; and (4) Celotex was not afforded due process. We disagree; therefore, we affirm the trial court's final order.

## I.

### FACTS

From 1965 to 1974, Jennings Davis was employed as a plumber/pipefitter by several electric power generating plants. During his employment, Mr. Davis was exposed to asbestos-containing products, which were manufactured by numerous companies, including Celotex. As a result, Mr. Davis developed asbestosis and lung cancer and died from lung cancer in 1987.

On November 26, 1986, Ronald Davis, as executor of his father's estate, filed suit against several asbestos manufacturers, including Celotex. Prior to trial, all of the defendants settled with the plaintiff except Owens–Corning Fiberglas, Owens–Illinois, H–K Porter, and Celotex. Following a month-long trial, the jury awarded the

1. The jury also assessed punitive damages against the remaining defendants; however, none of them are involved in this appeal.

2. This procedure is authorized under Syllabus Point 7, in part, of *Board of Education v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990): "Defendants in a civil action against whom a verdict is rendered are entitled to have the verdict reduced by the amount of

plaintiff $66,000 in compensatory damages and assessed Celotex $40,000 in punitive damages.[1] After denying Celotex's motions for judgment notwithstanding the verdict and for a new trial, the trial court, in a final order dated February 2, 1990, imposed $40,000 in punitive damages against Celotex. The compensatory damages were offset by previous settlements the plaintiff had made with the other defendants.[2]

## II.

### INSUFFICIENT EVIDENCE

Initially, Celotex argues that the $40,000 award for punitive damages is not justified because there was insufficient evidence presented at trial that Celotex or any of its predecessors, particularly Philip Carey Manufacturing Company (Philip Carey),[3] was engaged in willful or wanton conduct. We disagree.

■ Our law with regard to what evidence will justify an award of punitive damages has existed for nearly one hundred years and is contained in Syllabus Point 4 of *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895):

"In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous."

A slightly different version of this standard is found in Syllabus Point 3 of *Warden v. Bank of Mingo*, 176 W.Va. 60, 341 S.E.2d 679 (1985):

" 'To sustain a claim for punitive damages, the wrongful act must have been done maliciously, wantonly, mischievous-

any good faith settlements previously made with the plaintiff by other jointly liable parties."

3. The Philip Carey Manufacturing Company manufactured asbestos products and was acquired by Celotex in 1972. The history of this acquisition and Celotex's liability as the successor corporation are discussed in Part III, *infra*.

ly, or with criminal indifference to civil obligations. A wrongful act, done under a bona fide claim of right, and without malice in any form, constitutes no basis for such damages.' Syl. pt. 3, *Jopling v. Bluefield Water Works & Improvement Co.*, 70 W.Va. 670, 74 S.E. 943 (1912)."

*See also Jarvis v. Modern Woodmen of Am.*, 185 W.Va. 305, 406 S.E.2d 736 (1991); *C.W. Dev., Inc. v. Structures, Inc.*, 185 W.Va. 462, 408 S.E.2d 41 (1991).

In *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 691, 289 S.E.2d 692, 702 (1982), we outlined several reasons for awarding punitive damages: "(1) to punish the defendant; (2) to deter others from pursuing a similar course; and, (3) to provide additional compensation for the egregious conduct to which the plaintiff has been subjected." (Footnote omitted). *See also Jarvis v. Modern Woodmen of Am., supra; Perry v. Melton*, 171 W.Va. 397, 299 S.E.2d 8 (1982). In note 15 of *Hensley v. Erie Insurance Co.*, 168 W.Va. 172, 183, 283 S.E.2d 227, 233 (1981), we further explained that the possibility of recovering punitive damages can "encourage a plaintiff to bring an action where he might be discouraged by the costs of the action or by the inconvenience" and can also serve as "a substitute for personal revenge by the wronged party." (Citations omitted).

At trial, the plaintiff introduced the testimony of two experts on the health risks associated with exposure to asbestos. The first witness, Dr. Barry Castleman, has authored several publications on the hazards of asbestos, has served as a consultant for numerous federal regulatory agencies, and has taught courses on this topic. Dr. Castleman testified extensively about American medical literature, published as early as 1918, documenting the dangers of asbestos. After reciting the health risks identified in these publications, Dr. Castleman opined that during the 1930s, there was a wealth of published information on

the risk of breathing asbestos dust from which asbestos manufacturers should have known of the problem and provided warnings to their workers.[4]

The second expert to testify for the plaintiff was Dr. Thomas Mancuso. Dr. Mancuso was the Chief of the Division of Industrial Hygiene for the State of Ohio from 1945 to 1962. In October, 1962, Dr. Mancuso was hired by Philip Carey as a special consultant to assist the company in developing policies and procedures to protect its workers from asbestosis. Philip Carey requested Dr. Mancuso's service because several of its employees had filed workers' compensation claims alleging that they suffered from work-related asbestosis. During his employment, Dr. Mancuso advised Philip Carey about the grave risks associated with exposure to asbestos, including the link between asbestos exposure and cancer. In his final report, dated September 23, 1963, Dr. Mancuso reiterated the dangers of asbestos exposure. He also made a series of recommendations to protect workers who were exposed to asbestos and outlined steps Philip Carey should take to limit its future legal liability. Apparently displeased with this report, Philip Carey fired Dr. Mancuso within a week of its submission. Despite Dr. Mancuso's findings, Philip Carey apparently did nothing.

As we explained in Syllabus Point 1 of *Bolling v. Clay*, 150 W.Va. 249, 144 S.E.2d 682 (1965):

" 'In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.' Point 3 Syllabus, *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 [ [1963] ]."

---

4. For example, Dr. Castleman testified about an article entitled "Pulmonary Asbestosis," which was published in a 1930 issue of the trade magazine, *Asbestos*. The article discussed fifteen cases of pulmonary asbestosis among workers in an asbestos factory and concluded that asbestos dust causes pulmonary fibrosis. Ironically, Philip Carey, Celotex's predecessor, had an advertisement in this same issue.

*See also Duty v. Walker*, 180 W.Va. 149, 375 S.E.2d 781 (1988). Applying this standard to the instant case, we believe that there was sufficient evidence in the record to support the jury's finding that Celotex, through the acts of its predecessor, intentionally, willfully, and with reckless disregard concealed the health risks associated with exposure to asbestos and deliberately decided to take no measures to reduce those risks.

This type of evidence has been found sufficient to justify a jury instruction on punitive damages in asbestos injury cases in other jurisdictions. For example, in *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1288 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990), the Court of Appeals for the Second Circuit found this evidence sufficient:

> "A review of the evidence shows that the award of punitive damages was supported by the evidence as a matter of law. Plaintiff produced evidence at trial through expert witnesses, medical reports and documents from which the jury could reasonably conclude that appellants acted in a wanton or reckless manner. For example, plaintiff's expert witness testified that a link between asbestos and lung cancer was suspected as early as 1930 and that this link was considered to be probable shortly after 1940. Another expert witness stated in his deposition that by 1942 there was enough cases of the association between lung cancer and asbestos to include this information in a medical textbook on occupational cancer."

*See also Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.), *cert. denied*, 497 U.S. 1057, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990) (applying New York law); *City of Greenville v. W.R. Grace Co.*, 827 F.2d 975 (4th Cir.1987) (applying South Carolina law); *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394 (5th Cir.), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) (applying Mississippi law); *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (applying Tennessee law); *Hebron Public School Dist. No. 13 v. U.S. Gypsum*, 953 F.2d 398 (8th Cir.1992) (applying North Dakota law); *Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 512 A.2d 466 (1986).

■ Thus, we conclude that when an asbestos manufacturer has actual or constructive knowledge of the severe health hazards caused by a product and continues to manufacture and distribute that product, the manufacturer may be found liable for punitive damages to those injured by the product.

### III.

### ASSESSMENT OF PUNITIVE DAMAGES AGAINST A CORPORATE SUCCESSOR

Celotex next argues that even if its predecessors engaged in willful and wanton conduct, Celotex is merely an innocent third party who should not be liable for their reprehensible conduct. Although Celotex continued to manufacture and distribute asbestos-containing materials, it argues that because it placed warning labels on the products, it was not engaged in the sort of egregious conduct that warrants punitive damages. Celotex contends that it is only guilty of acquiring a company that knowingly concealed the dangers of asbestos.

In this case, the decedent was exposed to asbestos from 1965 to 1974, and during most of this period Celotex's predecessors were the manufacturers of asbestos products. The claim for punitive damages against Celotex was in large part based on the action of its predecessors, and the evidence at trial of willful and wanton conduct focused on them.

Celotex's corporate history is as follows. Its original predecessor, Philip Carey, was incorporated in Ohio in 1888. Philip Carey manufactured certain building products containing asbestos, including roofing materials, wall board, and certain forms of insulation. In June of 1967, Philip Carey merged with the Glen Alden Corporation. Immediately after the merger, Philip Carey

transferred all of its assets, subject to liabilities, and became a wholly owned subsidiary of Glen Alden. On April 9, 1969, this new corporation merged with another Glen Alden subsidiary, the Briggs Manufacturing Company. The surviving company was named the Panacon Corporation. In 1972, Celotex purchased all of the Panacon Corporation stock for cash and merged Panacon into Celotex, at which point Panacon ceased to exist. After the 1972 merger, there was no commonality of ownership between Celotex and any of its predecessors.

At common law, it was generally held that the purchaser of all the assets of a corporation was not liable for the debts or liabilities of the corporation purchased. This rule has since been tempered by a number of exceptions and statutory provisions. *See generally* 19 Am.Jur.2d *Corporations* § 2704 (1986); 19 C.J.S. *Corporations* § 810 (1990). We recognized this general rule to a limited extent in *Geo. E. Warren Co. v. A.L. Black Coal Co.*, 85 W.Va. 684, 690, 102 S.E. 672, 674 (1920), where we said:

> "The stockholders of the old company, if they acted in good faith, and there is no averment that they did not, had a right to organize a new corporation to buy the property of the insolvent one, and when the new company purchased at the judicial sale it took the property free from the obligation of plaintiff's contract." (Citations omitted).

Even at common law, there were a number of well-settled exceptions that would result in a transferee corporation being liable. These exceptions are outlined in 19 Am.Jur.2d *Corporations* § 2705 at 515 (1986):

> "—there is an express or implied assumption of liability;
>
> "—the transaction amounts to a consolidation or merger;
>
> "—the transaction was fraudulent;
>
> "—some of the elements of a purchase in good faith were lacking, as where the

transfer was without consideration and the creditors of the transferor were not provided for;

> "—the transferee corporation was a mere continuation or reincarnation of the old corporation." (Footnotes omitted).

A majority of jurisdictions have recognized these principles. *See, e.g., Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985) (applying Pennsylvania law); *Man v. Raymark Indus.*, 728 F.Supp. 1461 (D.Haw.1989) (applying Hawaii law); *Sinquefield v. Sears Roebuck & Co.*, 209 Ill.App.3d 595, 154 Ill.Dec. 325, 568 N.E.2d 325 (1991); *C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, Inc.*, 412 N.W.2d 593 (Iowa 1987); *Nissen Corp. v. Miller*, 323 Md. 613, 594 A.2d 564 (1991); *Western Resources Life Ins. Co. v. Gerhardt*, 553 S.W.2d 783 (Texas Civ.App.1977); *Fox v. Sunmaster Prods., Inc.*, 63 Wash.App. 561, 821 P.2d 502 (1991), *review denied,* 118 Wash.2d 1029, 828 P.2d 563 (1992); *Schweiner v. Hartford Acc. & Indem. Co.*, 120 Wis.2d 344, 354 N.W.2d 767 (App.1984). *See generally* 1 L. Frumer & M. Friedman, *Products Liability* § 2.06[2] (1989); 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (1990).

In Syllabus Point 2 of *Billmyer Lumber Co. v. Merchants' Coal Co.*, 66 W.Va. 696, 66 S.E. 1073 (1910), we also recognized that an agreement by a corporation to purchase another corporation's assets and assume its liabilities made the purchaser liable for the other's debts:

> "When property has been conveyed in consideration of the assumption by the grantee of all the indebtedness of the grantor, any creditor of the latter may charge the property in the hands of the grantee with his debt, and subject the same to payment thereof."

Moreover, the liability of a successor corporation is statutorily mandated under W.Va. Code, 31–1–37(a)(5) (1974).[5]

---

5. W.Va.Code, 31–1–37(a)(5), states:
 "Such surviving or new corporation shall henceforth be responsible and liable for all

the liabilities and obligations of each of the corporations so merged or consolidated; *and any claim existing or action or proceeding*

■ Thus, we conclude that a successor corporation can be found liable for the debts and obligations of a predecessor corporation if there was an express or implied assumption of liability, if the transaction was fraudulent, or if some element of the transaction was not made in good faith. Successor liability will also attach in a consolidation or merger under W.Va.Code, 31–1–37(a)(5). Finally, such liability will also result where the successor corporation is a mere continuation or reincarnation of its predecessor.

■ While the foregoing rule relates to successor liability in general, this case deals with the imposition of punitive damages arising from the manufacturing and distribution of asbestos products. In this situation, courts have focused primarily on the express assumption of liability in the corporate merger agreement, although in each case the successor corporation continued to manufacture asbestos. Thus, it is the acquisition or merger of a company, along with the express assumption of liability, that makes a successor corporation liable for punitive damages. *See, e.g., Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992); *King v. Armstrong World Indus., Inc.*, 906 F.2d 1022 (5th Cir.1990), *cert. denied, Celotex Corp. v. King,* —— U.S. ——, 111 S.Ct. 2236, 114 L.Ed.2d 478

(1991); *Man v. Raymark Indus., supra; Krull v. Celotex Corp.*, 611 F.Supp. 146 (N.D.Ill.1985); *Wall v. Owens–Corning Fiberglas Corp.*, 602 F.Supp. 252 (N.D.Tex. 1985); *Hanlon v. Johns–Manville Sales Corp.*, 599 F.Supp. 376 (N.D.Iowa 1984); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357 (E.D.Pa.1982), *aff'd, Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir.1985); *Sheppard v. A.C. & S. Co.*, 484 A.2d 521 (Del.Super.1984); *Celotex Corp. v. Pickett*, 490 So.2d 35 (Fla. 1986). *See generally* Annot., 55 A.L.R.4th 166 (1987 & Supp.1991).

The typical reasoning of these courts is found in *Glasscock v. Armstrong Cork Co., supra,* which involved a consolidated appeal by Armstrong and Celotex. The Court of Appeals for the Fifth Circuit traced the history of the various corporate mergers leading to the 1972 merger[6] and then discussed Celotex' liability under Texas law:

"Celotex purchased all of the stock of Panacon in 1972. Under Texas law, a successor corporation is generally not liable for its predecessor's obligations when it acquires the predecessor by purchasing all or substantially all of the corporation's assets. Tex.Bus.Corp.Act Ann. art. 5.10(B)(2). In this case, however, Celotex expressly assumed:

'All debts, liabilities and duties of Panacon to such an extent that they may

pending by or against any of such corporations may be prosecuted as if such merger or consolidation had not taken place, or such surviving or new corporations may be substituted in its place. Neither the rights of creditors nor any liens upon the property of any such corporation shall be impaired by such merger or consolidation." (Emphasis added).
A similar provision has existed in our corporate merger statute since 1937. *See* W.Va.Code, 31–1–63 (1937).

In note 9 of *Man v. Raymark Industries*, 728 F.Supp. at 1468, the court, in discussing a conflict of law question, noted that Celotex was incorporated in Delaware and that its principal place of business was in Florida:

"This court notes that courts in both Delaware and Florida, two states with an interest in applying their merger and contract laws over Celotex, have ruled that Celotex *is* liable for punitive damages. *Celotex Corp. v. Pickett*, 490 So.2d 35 (Fla.1986); *Sheppard v. A.C. & S.*

Co., 484 A.2d 521 (Del.Super.1984). As this court finds Hawaii law to be consistent, there is no need to determine which law 'best serves the states and parties.' All law points to the imposition of punitive damage liability."

**6.** The Court of Appeals in *Glasscock,* 946 F.2d at 1094, stated:

"Panacon Corporation succeeded to the interest and liabilities of the original Philip Carey Manufacturing Company. Philip Carey merged into Briggs Manufacturing Company in 1970. Briggs changed its name to Panacon Corporation on that same date. *Under Texas law, the surviving corporation of a merger assumes the liabilities of each of the merging corporations. Tex.Bus.Corp.Act Ann. art. 5.06(A)(3).* After the corporate name change, Panacon was the surviving corporation of the merger between Philip Carey and Briggs, and was responsible for Philip Carey's liabilities." (Emphasis added).

be enforced against it to the same extent as if such debts, liabilities, and duties had been incurred or contracted by Celotex.'

Panacon's liabilities included the liabilities of Philip Carey it inherited from the merger. Celotex in turn expressly assumed responsibility for these liabilities through its purchase of Panacon.

"Panacon and later Celotex distributed the asbestos containing products which caused the plaintiffs' injuries. Philip Carey's corporate history, as established by plaintiffs' evidence, together with Celotex's express assumption of liability, support the district court's decision to hold Celotex liable for Philip Carey's acts. The district court properly permitted the jury to assess punitive damages against Celotex for the acts of Philip Carey." 946 F.2d at 1094–95.

*Glasscock's* reasoning is applicable to this case. Moreover, the Court of Appeals imposed liability on Celotex under the Texas corporation statute, which is similar to our merger statute. *See* W.Va.Code, 31–1–37(a)(5).[7]

Much the same analysis was used by the Florida Supreme Court in *Celotex Corp. v. Pickett,* 490 So.2d at 38, when it found Celotex liable for punitive damages as a successor corporation based on Florida's merger statute. We agree with the Florida court's summary of policy reasons articulated by other courts:

"[C]orporations are in a very real sense, 'molders of their own destinies' in acquisition transactions, with the full panoply of corporate transformations at their disposal. When a corporation, such as Celotex here, voluntarily chooses a formal merger, it will take the 'bad will' along with the 'good will.' *See Krull v. Celotex Corp.,* 611 F.Supp. 146 (N.D.Ill.1985). We will not allow such an acquiring corporation to 'jettison inchoate liabilities into a never-never land of transcorporate limbo.' *Wall v. Owens–Corning Fiberg-*

*las Corp.,* 602 F.Supp. 252, 255 (N.D.Tex. 1985)."

While we find Celotex's argument without merit, this is not to say that every acquisition or merger will automatically result in punitive damage liability. Here, at the time of the merger, the extreme health hazards associated with asbestos products were well known. The continuation of the business was a direct and deliberate product of the merger. Thus, we conclude that when a corporation acquires or merges with a company manufacturing a product that is known to create serious health hazards, and the successor corporation continues to produce the same product in the same manner, it may be found liable for punitive damages for liabilities incurred by the predecessor company in its manufacture of such product.

### IV.

### MULTIPLE CLAIMS FOR EXEMPLARY DAMAGES

█ Celotex asks us to focus not only on the punitive damage award in this case, but also on the punitive damage awards levied against it in prior cases and on its continued exposure to future litigation. Celotex contends that multiple punitive damage awards for a single course of conduct result in overkill, may cause a total depletion of its corporate assets, and are fundamentally unfair under the Due Process Clause. The plaintiff counters that Celotex was provided an opportunity to voice these substantive due process concerns to the jury by introducing evidence of the prior punitive damage awards and arguing that it had been sufficiently punished.

The substantive due process concern in mass-tort cases first surfaced in *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832 (2d Cir.1967). There, the court, by way of dictum, stated: "We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so adminis-

---

**7.** See note 5, *supra,* for the text of W.Va.Code, 31–1–37(a)(5), and its prior statutory counter- part.

tered as to avoid overkill." 378 F.2d at 839. It then concluded, however, that there appeared to be no law forbidding such multiple awards:

> "We know of no principle whereby the first punitive award exhausts all claims for punitive damages and would thus preclude future judgments.... Neither does it seem either fair or practicable to limit punitive recoveries to an indeterminate number of first-comers, leaving it to some unascertained court to cry, 'Hold, enough,' in the hope that others would follow." 378 F.2d at 839–40.

Later cases from the Second Circuit have affirmed punitive damage awards in mass-tort asbestos cases over similar substantive due process objections, as illustrated in *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.), *cert. denied*, 497 U.S. 1057, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). In *Simpson*, the court observed that individual cases may have different factual components which will affect whether punitive damages are awarded and their amount:

> "We do not agree with appellant's assumption that all asbestos cases in which Pittsburgh Corning is a defendant may be lumped together for the purpose of testing punitive awards against the limits of due process. The wrongfulness of a defendant's conduct will normally be subject to varying assessments depending on the degree to which the dangers of its product were known at a particular time and the deliberateness of its conduct in declining to warn or even concealing dangers of which it was aware." 901 F.2d at 281.

A second reason recognized for rejecting a procedure limiting the number of punitive damage awards was that there is usually no evidence in the record on the amounts and make-up of the prior punitive damage awards or the sums paid in settlements. "[I]t is far from clear that sums paid in private settlements may validly be counted in determining when state-compelled punitive damages awards exceed the limits of the Fourteenth Amendment." 901 F.2d at 282.

The majority of courts faced with this issue have held that punitive damages do not violate substantive due process. The Fifth Circuit Court of Appeals in *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d at 405, made an extensive analysis of the cases and summarized some of the reasons advanced in upholding punitive damages:

> "In Oregon, for example, the Supreme Court recently ruled in a 'mass tort' case that the 'financial interests of the malicious and wanton wrongdoer must be considered in the context of societal concern for the injured and the future protection of society.' *State ex rel. Young v. Crookham*, 290 Or. 61, 618 P.2d 1268, 1271 (1980). An Illinois court recently explained that it did 'not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons.' *Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 63 Ill.Dec. 261, 264, 437 N.E.2d 910, 913 (1982), *rev'd on other grounds*, 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983)." [8]

Finally, we note that it seems highly illogical and unfair for courts to determine at what point punitive damage awards should cease. Obviously, those plaintiffs whose cases were heard first would gain the punitive monetary advantage. Certainly, it would be difficult to determine where the cutoff line should be drawn as between

---

**8.** In *Jackson*, the court surveyed the literature on this topic:

> "[S]everal commentators writing on the issue of punitive damages in mass tort cases have concluded that punitive damages should be generally available in mass tort cases. *See, e.g.*, Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1258 (1976); Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Ef-*

*ficiency and Control*, 52 Fordham L.Rev. 37 (1983); Note, *In Defense of Punitive Damages*, 55 N.Y.U.L.Rev. 303 (1980)." 781 F.2d at 406. *See also* J.C. Glasscock, *Emptying the Deep Pocket in Mass Tort Litigation*, 18 St. Mary's L.J. 977 (1987); J. Fieweger, *The Need for Reform of Punitive Damages in Mass Tort Litigation: Juswin v. Amtorg Trading Corp.*, 39 De Paul L.Rev. 775 (1990).

the first, tenth, or hundredth punitive damage award. Moreover, because asbestos trials are held nationwide, it is doubtful that one state's ruling would necessarily bind other jurisdictions.

The problem in this case is that we are not presented with a developed factual record on the circumstances and the amounts of prior punitive damage awards that have been paid by Celotex. We, therefore, find ourselves in much the same position as the Court of Appeals for the Second Circuit did in *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d at 282, when confronted with the same substantive due process argument:

> "In more recent encounters with the issue, we have concluded that the substantive due process claim was neither adequately raised, *Racich v. Celotex Corp.*, 887 F.2d [393] 398 [(2d Cir.1989)], nor factually supported in the district court, *Johnson v. Celotex Corp.*, 899 F.2d [1281] 1288 [(2d Cir.1990)]; *Racich v. Celotex Corp.*, 887 F.2d at 398. The absence of an adequate record similarly defeats the claim in this case."

Thus, we conclude that when the record fails to set out sufficient facts to answer the question of whether substantive due process has been violated by multiple punitive damage awards in asbestos cases, we will decline to address the issue.

## V.

## DUE PROCESS

■ Celotex's final argument is that the procedural due process safeguards for punitive damages outlined in *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), were not followed. We note initially that this case was tried before *Garnes*, and, therefore, neither trial counsel nor appellate counsel had the benefit of its guidance. In this case, the punitive damage award was $40,000, while the compensatory damage award was $66,000.

In *Garnes*, we discussed the history of punitive damages with particular emphasis on *Pacific Mutual Life Insurance Co. v. Haslip*, — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In Syllabus Point 3 of *Garnes*, we outlined five factors that should be considered by the jury in awarding punitive damages. These factors may be summarized: (1) Such damages should bear a reasonable relationship to the harm occurring from defendant's conduct; (2) the jury should consider elements pointing to the reprehensibility of the defendant's conduct; (3) the defendant's profit from the wrongful conduct should be less than the punitive damages; (4) punitive damages should bear a reasonable relationship to the compensatory damages; (5) the financial condition of the defendant is relevant.[9]

Moreover, in Syllabus Point 4 of *Garnes*, we spoke to what factors the trial court

**9.** The full text of Syllabus Point 3 of *Garnes* is:

"When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

"(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

"(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

"(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

"(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

"(5) The financial position of the defendant is relevant."

should review in addition to those given to the jury.[10] Finally, in Syllabus Point 5 of *Garnes*, we discussed our review of a petition for appeal and stressed that "all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject[.]" We concluded in this syllabus point with the admonition that "[a]ssignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law." [11]

██ Celotex' attack on the punitive damage award is based solely on the fact that the trial court's instruction did not contain all of the language set out in Syllabus Points 3 and 4 of *Garnes*. However, Celotex fails to argue why the punitive damage award was unfair. As we have earlier noted, Celotex' conduct was egregious enough to impose punitive damages. Certainly, the ratio between the compensatory and punitive damage awards is not unreasonable. In view of Celotex' failure to specify facts that would warrant a finding that the punitive damage award was unreasonable, we decline under Syllabus Point 5 of *Garnes* to set aside the award.

In sum, we hold that in cases tried before *Garnes* in which punitive damages were awarded, we will not set aside such awards if there is a factual basis for the punitive damages, if the punitive damages bear a reasonable relationship to the compensatory damages, and if the parties' main assignment of error is that the trial court's instruction did not contain all of the factors enunciated in *Garnes*.

## VI.

In light of the foregoing principles, we affirm the judgment of the Circuit Court of Monongalia County.

Affirmed.

---

**10.** Syllabus Point 4 of *Garnes* states:

"When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

"(1) The costs of the litigation;

"(2) Any criminal sanctions imposed on the defendant for his conduct;

"(3) Any other civil actions against the same defendant, based on the same conduct; and

"(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff. Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know [*sic*] them, but that will require downward adjustment by the trial court through remittitur because of

factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury."

**11.** The text of Syllabus Point 5 of *Garnes* states:

"Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law."