**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1259**

JORDAN ESKRIDGE,

              Plaintiff - Appellant,

        v.

PACIFIC CYCLE, INC., a foreign corporation; WAL-MART STORES
EAST, LP,

              Defendants – Appellees,

        and

WAL-MART STORES, INC., a foreign corporation; KUN TENG
INDUSTRY CO., LTD, a foreign corporation,

              Defendants.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston.   Joseph R. Goodwin,
District Judge.  (2:11-cv-00615)

Argued:  December 10, 2013           Decided:  January 17, 2014

Before TRAXLER, Chief Judge, and WILKINSON and DAVIS, Circuit
Judges.

Affirmed in part, reversed in part, and remanded by unpublished
per curiam opinion.

**ARGUED**: Christopher Brinkley, MASTERS LAW FIRM, LC, Charleston,
West Virginia, for Appellant.   Tanya Annette Hunt Handley,

MACCORKLE LAVENDER PLLC, Charleston, West Virginia, for Appellees. **ON BRIEF**: John L. MacCorkle, Charleston, West Virginia, Heather M. Noel, MACCORKLE LAVENDER PLLC, Morgantown, West Virginia, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

2

PER CURIAM:

Jordan Eskridge appeals a district court order granting summary judgment against him in his products liability action. We affirm in part, reverse in part, and remand for trial.

I.

This case arises out of injuries that Eskridge suffered while riding his Mongoose XR100 bicycle when he was 13 years old. Eskridge's father bought the bicycle, which was equipped with a Quando quick-release hub, at a Wal-Mart in Beckley, West Virginia. The bicycle was preassembled and it came with an owner's manual. Eskridge enjoyed the bike for more than three years without incident, but then one day, as he was riding over a speed bump, he crashed and suffered very serious injuries.

Eskridge eventually filed suit in West Virginia state court, naming as defendants – as is relevant here – Pacific Cycle, Inc., which designed the bike, and Wal-Mart Stores, Inc., which sold it to Eskridge's father.[1] He alleged that as he rode over the speed bump on the day he was injured, the bicycle's front wheel separated from the front forks and when the bicycle came down the front wheel was jammed into the forks, stopping the bicycle suddenly and causing him to strike the handlebars

_____

[1] Wal-Mart Stores East, LP, was later substituted for Wal-Mart Stores, Inc. We will refer to Pacific Cycle, Inc., and Wal-Mart Stores East, LP, as "Defendants."

and fall to the ground.  Eskridge asserted causes of action for strict liability, negligence, and breach of warranty, and he sought compensatory and punitive damages.  He claimed that "[a]s a result of deficiencies in design, testing, assembly, inspection, and provision with instructions and warnings, the Mongoose XR100, and/or its Quando quick-release hub, were defective" in several respects.  J.A. 25.

Defendants later removed the action to federal district court and eventually moved for summary judgment.  Defendants maintained that Eskridge could not prove that the quick-release hub in the Mongoose XR100 ("Mongoose") was defectively designed because Eskridge's expert, James Green, conceded that, if used properly, the quick release is "one of the best clamping mechanisms in the world."  J.A. 220.  The Defendants also maintained that no failure-to-warn or inadequate-labeling theory could succeed because neither Green nor Eskridge offered evidence of the "industry standard, exemplar owner's manuals or any other document or standard" and because Green offered no basis for believing that providing warnings and instructions in the owner's manual was an inadequate method by which to communicate the applicable warning to the user.  J.A. 62.

Eskridge then filed a response detailing his theories, based on Green's report and testimony, that the Mongoose was defective in several different respects.  Understanding Green's

4

opinions requires a little background regarding the quick-release mechanism.

A quick-release mechanism allows a bicycle's front wheel to be removed quickly and without tools. Although originally designed for racing bicycles, the device also can benefit the casual rider who is removing the wheel for any reason, such as to transport the bicycle, lock it up in public, or change a flat tire. Consequently, even most bicycles sold for casual use are equipped with a quick-release hub.

On a bicycle equipped with such a device, the front "fork blades," which are the arms of the bicycle holding the wheel, each have a u-shaped "dropout" on their end. And, the axle of the front wheel has a cylindrical hollow space running through it. The quick-release mechanism is a rod that is threaded on one end and that has a lever-operated cam assembly on the other. With such a system, the wheel is connected to the bicycle when the rod is placed through the hollow part of the front wheel axle so that it protrudes a little bit on either end. The wheel is then situated between the fork blades so that both ends of the rod fit in the dropouts. To secure the wheel, a nut on one end of the rod is tightened and the lever on the other side is pressed inward. The lever tightens the rod so that the mechanism is pushing on each dropout from the outside. This

5

pressure keeps the wheel attached while the bicycle is being ridden.

Green inspected Eskridge's bicycle and concluded that it was defective in three ways. First, the fork holding the front wheel was defective because the fork blades' ends were open rather than closed. Green opined that open-fork systems created the reasonably foreseeable risk that a user would install his quick-release hub improperly, which would cause the hub to separate from the fork during use. Green noted that even for intelligent users who are attempting to follow perfect instructions, fastening a quick release is a "subtle" process that is often done incorrectly. J.A. 208. Green also opined that there was no benefit to a casual rider of an open-fork system.

Second, Green concluded that, the inherent problems with the open-fork system aside, the design of the Mongoose's open-fork system differed from that of the vast majority of open-fork designs in the industry, such that it was a far trickier process to install the hub correctly on the Mongoose. The problem as Green described it is that protuberances at the end of each dropout in an open-fork mechanism generally serve to keep the wheel from separating from the bicycle in the event that the hub has not been installed correctly. However, with the Mongoose, "you can put the wheel on" and yet not "get it over the

protuberances completely." J.A. 210. "[I]f you don't have it seated just perfectly, [so] that it's off just a little bit on either side so that it's not completely clearing the protuberance when you fasten it, it comes right out of there" during use. J.A. 210. Green testified that his investigation indicated that that most likely is exactly what happened to Eskridge to cause the accident. Green explained that, in contrast, with the industry-standard open-fork design, "it's almost impossible to . . . fasten the quick release in there with it at an angle or onto the tips. You have to get over the tips in order to fasten it." J.A. 211. Thus, the risk of mistakenly believing that the hub is properly installed is much greater on the Mongoose.

Finally, Green opined that the bicycle's warnings and instructions regarding the quick release were inadequate because they were contained only in the owner's manual. In Green's experience, most bicycle owners do not read their owner's manuals, and he has found that quick-release warnings are effective only when a warning label is placed on the quick-release itself or warnings are actually provided to the consumer at the point of sale.

Eskridge also argued in his response memorandum that Green's acknowledgement that the quick release is one of the world's best clamping systems if used properly did not doom his

7

design-defect theories because it was reasonably foreseeable that the quick release would not in fact be used properly. He further contended that he was not required to prove noncompliance with government or industry standards to prove defectiveness under either a failure-to-warn or a design theory. And he argued that he had created a jury issue regarding his entitlement to punitive damages because, prior to the manufacture of the bicycle, Defendants were aware of the potential for mis-installation of quick-release hubs and the associated dangers to riders; they were aware of customer complaints of quick-release wheels separating from bicycles and causing accidents; they conducted no technical quality assurance on the bicycle; and they made no effort to ensure that their warnings and instructions regarding quick-release hubs were actually reaching owners and were effectively conveying necessary instructions and warnings.

Defendants then filed a reply generally reiterating the arguments they presented in their initial memorandum. In a footnote, however, they also added that while Green "may be an expert on bicycles, there has been nothing offered to suggest that [he] is an expert in labeling or in the retail industry." J.A. 324 n.2 (citing a case in which Green was held unqualified to offer an expert opinion "on the standards or customs of the

8

retail industry because he has not indicated any background in that area" (internal quotation marks omitted)).

The parties then argued the summary judgment motion before the district court. During that argument, Defendants did not challenge the admissibility of any expert testimony that Green would provide. Following argument, the court took the motion under advisement.

While the summary judgment motion was still pending, Defendants moved in limine to preclude Green from testifying: (1) concerning deficiencies in the owner's manual; (2) that most bicyclists do not read owner's manuals; (3) that the labeling on the bicycle was inadequate; (4) or about retail industry standards. The motion was based on contentions that Green had not criticized the substance of the warnings contained in the owner's manual, that he was not an expert in labeling or the retail industry, and that Eskridge had not forecasted any admissible testimony on the identified issues. Regarding the lack of admissible testimony, Defendants specifically asserted that Green's testimony in these areas was neither reliable nor relevant, and they argued that it was not based on sufficient data since Green admitted he had "never studied the issue of people reading their owner's manuals." J.A. 365.

Eskridge then filed a response discussing Green's qualifications to testify regarding warnings, labels, owner's

manuals, and retail industry standards, which included the following facts. Green is a professional engineer with more than 30 years experience, and he has worked on more than 500 cases involving quick-release hub bicycle accidents. His book, Bicycle Accident Reconstruction for the Forensic Engineer, features a chapter on quick-release hubs and their role in accidents, and he has published many articles on that subject. Creating appropriate warnings and labels for a particular design, so that they accurately convey the necessary information to the product user, was an integral part of his engineering education. Since 1976, Green has "evaluated and made recommendations regarding user and training manuals for all major bicycle manufacturers." J.A. 385. And, he helped develop a label to be placed on the flange of one manufacturer's quick-release hubs to warn users of the potentially catastrophic results of misusing a quick-release hub. Green also has extensive experience creating manuals in other industries. Finally, he has been retained by several retailers, including Wal-Mart, Lowe's, Performance Bikes, and Brooklyn Bikes, to revise and implement appropriate retail industry standards.

Eskridge also argued in his response, as is relevant here, that Green's view that most bicycle users do not read their owner's manuals and that labels on the bicycle itself or point-

10

of-sale warnings were necessary was based on his decades of experience in the bicycle industry.

Two weeks later, the district court granted the Defendant's motion for summary judgment. See Eskridge v. Pacific Cycle, Inc., No. 2:11-cv-00615, 2013 WL 596536 (S.D. W. Va. Feb. 15, 2013). The court ruled that Eskridge's three theories that the Mongoose was defective were all essentially failure-to-warn theories because they all asserted unreasonable exposure to the danger that the user would misuse the product (by installing the quick-release hub incorrectly). See id. at *3-4. And the court added:

> Eskridge has simply provided no admissible evidence that the warnings were inadequate. Green merely offered his personal opinion that no one should ever rely upon an owner's manual to give warnings or instructions. This opinion is inadmissible for two reasons. First, Green does not base this opinion on "sufficient facts or data" required for expert opinions to be admissible. FED.R.EVID. 702. Second, while Green may be an expert on bicycle engineering and design, there is no evidence that he is qualified to offer an expert opinion on the standards of the retail industry.

Id. at *4 (citation omitted).

## II.

Eskridge first argues that the district court erred in granting summary judgment against him on his strict liability, breach of warranty, and negligence claims, all of which asserted

11

that Eskridge's injuries were caused by the Mongoose's defectiveness. We agree.

This court reviews de novo a district court's order granting summary judgment, applying the same standards as the district court. See Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." Horace Mann Ins. Co. v. General Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008).

Under West Virginia law, a product may be defective in "three broad, and not necessarily mutually exclusive, categories:  design defectiveness; structural defectiveness; and use defectiveness arising out of the lack of, or the inadequacy of, warnings, instructions and labels."[2] Morningstar v. Black &

---

[2] Under West Virginia law, a product distributor is held to the same standards as the product's manufacturer. See Dunn v. Kanawha Cty. Bd. of Educ., 459 S.E.2d 151, 157 (W. Va. 1995); Morningstar v. Black & Decker Manuf. Co., 253 S.E.2d 666, 683 n.22 (W. Va. 1979). Thus, these issues bear equally on both Defendants' entitlement to summary judgment.

12

Decker Manuf. Co., 253 S.E.2d 666, 682 (W. Va. 1979). Design defectiveness focuses "on the physical condition of the product which renders it unsafe when the product is used in a reasonably intended manner," while use defectiveness focuses "not so much on a flawed physical condition of the product, as on its unsafeness arising out of the failure to adequately label, instruct or warn." Id. In this context,

> [t]he term 'unsafe' imparts a standard that the product is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to economic costs, at the time the product was made.

Id. at 682-83.

At bottom, Eskridge alleges that the Mongoose, as it was designed, with the warnings that were included in the manual, unreasonably exposed the consumer to the danger that the quick-release would be fastened incorrectly and that the hub would separate from the fork, causing a crash. He advances three mutually exclusive theories as to why the Mongoose was defective, the first two of which he contends are design-defect theories and the third of which he contends is a use-defect theory. First, he claims that designing the bicycle with an open-fork system rather than a closed-fork system created a risk that a reasonable consumer – even one trying to follow adequate instructions – would install the quick-release hub incorrectly.

13

Second, he claims that even if open-fork systems generally are not unreasonably unsafe, the Mongoose's unusual design, which significantly increases the chance that a consumer will improperly install the quick-release hub, was unreasonably unsafe. And, third, he maintains that even if the bicycle could have been made reasonably safe had a warning been placed on the bicycle or given to the consumer at the point of sale, it was certainly not reasonably safe with the warning being contained only in the owner's manual.

In defending the grant of summary judgment, Defendants argue that if the Mongoose is reasonably safe when used properly, then it follows that it was not defectively designed. Defendants contend that since Eskridge's expert concedes that the bicycle is safe when used properly, i.e., when the quick-release hub is correctly installed,[3] then all of Eskridge's theories concerning the dangers of improper use are necessarily use-defect theories. Thus, Defendants continue, Eskridge can prove a defect in the Mongoose only by showing that the Mongoose's warnings or instructions concerning the quick-release hub were inadequate. And, Defendants argue that the district

---

[3] Green testified that open-fork quick-releases are "one of the best clamping mechanisms in the world if they're used properly." J.A. 220. The context of this testimony demonstrates that "if they're used properly" refers to whether the hubs are installed properly.

14

court correctly ruled, as a matter of law, that Eskridge could not prove the inadequacy of the Mongoose's warnings and instructions.

Eskridge rejects Defendants' characterization of his liability theories, however, and counters that the bicycle is designed defectively because its design creates an unreasonable risk that even reasonable people attempting to follow well-crafted instructions will misuse the bicycle. He alternatively takes issue with the district court's conclusion that he failed to forecast admissible evidence that the Mongoose's warnings and instructions were inadequate. We agree with Eskridge on both points and will address them seriatim.

## A. Design Defect

Although the district court characterized all three of Eskridge's defect theories as alleging use defectiveness, Eskridge's first two theories do not allege a "failure to adequately label, instruct or warn." Morningstar, 253 S.E.2d at 682. Rather, they assert that the Mongoose's design creates an unreasonable danger that no warning could adequately eliminate. The fact that Eskridge alternatively challenges the adequacy of the Mongoose's warnings does not somehow negate the fact that his primary challenges are to the bicycle's design.

Defendants maintain that the safety of a particular design concerns only whether it is safe for its "proper" use. Thus,

15

they argue that it makes no sense to claim that a product is defectively <u>designed</u> because the design creates an unreasonable risk of improper use. We do not believe the Supreme Court of Appeals of West Virginia would agree, however.

In determining whether a product is reasonably safe for its intended use, "[t]he question of what is an intended use of a product carries with it the concept of all those uses <u>a reasonably prudent person</u> might make of the product, having in mind its characteristics, warnings and labels." <u>Id.</u> at 683 (emphasis added). Thus, "the seller is not liable when the product is . . . used in some <u>unusual and unforeseeable</u> way, as when a wall decorating compound is stirred with the finger, or nail polish is set on fire, or an obstinate lady insists on wearing shoes two sizes too small." <u>Id.</u> (emphasis added); <u>see also</u> <u>Landis v. Hearthmark, LLC</u>, 750 S.E.2d 280, 291-93 (W. Va. 2013). These statements make clear that sellers are only entitled to have their users respond <u>reasonably</u> to the warnings and instructions; they are not entitled to anything more. In light of Green's testimony concerning the difficulty of installing the hub correctly even with perfect instructions, a reasonable jury could find that even a "reasonably prudent person" might fasten the Mongoose's release incorrectly and that such a mistake was a wholly "foreseeable" outcome. Thus, a reasonable jury could well accept Green's testimony that the

16

Mongoose's failure even to conform to the industry-standard open-fork design significantly increased the danger of incorrect installation and that the bicycle was defectively designed for that reason.

We note that this result is in line with section 2(b) of the Restatement (Third) of Torts – Products Liability (1998), which provides that "[a] product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . ., and the omission of the alternative design renders the product not reasonably safe."[4]  Comment *l* to section 2 provides that "[i]n general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks." Indeed, Illustration 14 in that section of the Restatement is quite pertinent to the facts before us here.  That illustration discusses the hypothetical example of a garbage truck's compaction chamber that warns in large letters on its outside

_____

[4] We observe that the Supreme Court of Appeals of West Virginia has cited the Restatement (Third) of Torts – Products Liability, for different propositions on other occasions.  See Bennett v. Asco Servs., Inc., 621 S.E.2d 710, 717-18 (W. Va. 2005) (per curiam); Strahin v. Cleavenger, 603 S.E.2d 197, 210 (W. Va. 2004).

17

panels "DANGER—DO NOT INSERT ANY OBJECT WHILE COMPACTION CHAMBER IS WORKING—KEEP HANDS AND FEET AWAY." The illustration notes that "[t]he fact that adequate warning was given does not preclude [a worker who falls into the machine] from seeking to establish" that the compactor was defectively designed by virtue of the fact that there was no guard to prevent such an accident. See also Sturm, Ruger & Co. v. Day, 594 P.2d 38, 44 (Alaska 1979) ("Where the most stringent warning does not protect the public, the defect itself must be eliminated if the manufacturer is to avoid liability."), modified, 615 P.2d 621 (Alaska 1980), overruled on other grounds by Dura Corp. v. Harned, 703 P.2d 396, 405 n.5 (Alaska 1985); Uloth v. City Tank Corp., 384 N.E.2d 1188, 1192 (Mass. 1978) ("Whether or not adequate warnings are given is a factor to be considered on the issue of negligence, but warnings cannot absolve the manufacturer or designer of all responsibility for the safety of the product.").

Similarly here, we conclude that the Supreme Court of Appeals of West Virginia would hold that despite the fact that users can be and were instructed regarding how to use the quick-release hub, that does not protect the seller, as a matter of law, from liability for failing to adopt a design that would have provided significantly better protection than any warning could. See David G. Owen, Warnings Don't Trump Design: The Rise and Fall of § 402A Comment j, 153 Products Liability

18

Advisory 1 (Nov. 2001); Howard Latin, "Good" Warnings, Bad Products, and Cognitive Limitations, 41 U.C.L.A. L. Rev. 1193, 1295 (June 1994) ("Good product warnings may be useful, indeed necessary, in many accident-prevention settings but their value is inherently limited and they consequently should not be treated as legally acceptable alternatives to safer product designs and marketing strategies."). Given Green's testimony that simply utilizing the industry-standard quick-release design would have significantly reduced the danger of misinstallation – with no apparent cost in utility – we conclude that a reasonable jury could find that the Mongoose was defectively designed. As the lack of proof of defect was the only basis the Defendants assert in support of their entitlement to summary judgment on the issue of liability, we reverse the grant of summary judgment on Eskridge's strict liability, breach of warranty, and negligence causes of action.

## B. Use Defect

We also conclude that the district court erred in ruling that Eskridge failed to at least create a genuine factual issue regarding whether the Mongoose contained a use defect, i.e., whether the Defendants "fail[ed] to adequately label, instruct or warn." Morningstar, 253 S.E.2d at 682.

Under Rule 702 of the Federal Rules of Evidence:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. We review a district court's evidentiary rulings, including the admissibility of expert testimony, for abuse of discretion. See General Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997).

Whether a product is defective for failure to warn "is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to the economic costs, at the time the product was made." Morningstar, 253 S.E.2d at 682–83. The adequacy of the method chosen by the manufacturer to warn the user of a particular danger is generally a question for the jury. See Ilosky v. Michelin Tire Corp., 307 S.E.2d 603, 611 (W. Va. 1983).

20

Green testified that the Mongoose was defective for failing to adequately warn users concerning the quick-release system because the warnings appeared only in the owner's manual and, in Green's experience, users did not read such warnings when they appeared only in manuals. Regarding Eskridge's claim that the Mongoose's warnings were defective, the district court ruled:

> Eskridge has simply provided <u>no admissible evidence</u> that the warnings were inadequate. Green merely offered his personal opinion that no one should ever rely upon an owner's manual to give warnings or instructions. This opinion is inadmissible for two reasons. First, Green does not base this opinion on "sufficient facts or data" required for expert opinions to be admissible. FED.R.EVID. 702. Second, while Green may be an expert on bicycle engineering and design, there is no evidence that he is qualified to offer an expert opinion on the standards of the retail industry.

<u>Eskridge</u>, 2013 WL 596536, at *4 (citation omitted).

As to the district court's second point, we note that the Defendants do not even attempt to defend the conclusion that Green was unqualified to testify as an expert as to the warnings. <u>See</u> Appellees' brief at 16 ("The court did not rule that Mr. Green is unqualified to testify as an expert as to warnings, rather, the court held that Eskridge 'has simply provided <u>no admissible evidence</u> that the warnings were inadequate.'"). A witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. While Green needed only one of those, <u>see</u> <u>Garrett v.</u>

21

Desa Indus., Inc., 705 F.2d 721, 724 (4th Cir. 1983), the record demonstrated that he had them all.  See supra, at 7-8.  We therefore conclude that to the extent the district court ruled that Green was not qualified to offer an expert opinion regarding the adequacy of the warning here, the court abused its discretion.

We also can find no foundation for the district court's conclusion that Green's opinion is not based on sufficient facts or data.  Green testified to extensively studying the issue of improper installation of quick-release hubs.  In Green's experience, he found that bicycle owners do not generally read their manuals and that quick-release warnings are effective only when a warning label is placed on the quick-release itself or the warnings are actually provided to the consumer at the point of sale.  Green's involvement with hundreds of cases of accidents involving quick-release systems and his decades of experience in the industry in general certainly provided him with a strong foundation for testifying regarding those facts.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Defendants contend that Green's own testimony shows that he in fact has not studied the question of whether people read

22

their bicycle manuals. They particularly note that when Green testified that most bicycle owners do not read their manuals and when he was asked whether that was "because riding a bicycle is kind of intuitive," he answered, "Well, that's probably the reason, although I've never studied it." J.A. 246-47. Defendants construe this testimony as meaning that Green had never studied whether people read their manuals. However, when Green's testimony is viewed in its entirety, it is plain he was stating that he never studied why they do not read their manuals.

Defendants also argue that the district court correctly determined that Green's testimony concerning the inadequacy of the warnings was inadmissible because it was "nothing more than his personal belief, rather than the professional opinion of an expert." Appellees' brief at 19. Green's years of experience as an engineer were well established, however, and he testified that all of the opinions that he provided in Green's reports and testimony were "to a reasonable degree of engineering certainty."[5] J.A. 256. That his opinion was a personal opinion

---

[5] To the extent that Defendants are suggesting that Green's personal conclusions as a professional engineer are not admissible because a plaintiff must demonstrate a deviation from industry standards and customs to prove defectiveness, they are simply incorrect. See Jones v. Patterson Contracting, Inc., 524 S.E.2d 915, 920-22 (W. Va. 1999) (per curiam).

23

does not somehow mean it was not a professional one. For all of these reasons, we can only conclude that the district court abused its discretion in ruling that Green's testimony concerning the inadequacy of the method Defendants employed in communicating their warnings would be inadmissible.

Finally, Defendants suggest that even if Green's testimony concerning the inadequacy of the warnings is admissible, they were entitled to have their instructions successfully followed, no matter how difficult it was to do so. For this position, Defendants rely on the statement in Morningstar that "'[t]he seller is entitled to have his due warnings and instructions followed; and when they are disregarded, and injury results, he is not liable.'" 253 S.E.2d at 683 (quoting W. Prosser, The Law of Torts, at 668-69 (4th ed. 1971)); see Landis, 750 S.E.2d at 292. However, whether the Mongoose's warnings and instructions were "due warnings and instructions" depends on the adequacy of the method Defendants chose to communicate them to the user, which Green's testimony called into question. In any event, as we discussed regarding Eskridge's design-defect theories, Morningstar does not suggest anything more than that users are required to take notice of the warnings and instructions and act reasonably with them in mind. See Morningstar, 253 S.E.2d at 683 ("The question of what is an intended use of a product carries with it the concept of all those uses a reasonably

24

prudent person might make of the product, having in mind its characteristics, warnings and labels." (emphasis added)). While Morningstar stated that a seller is not liable when his warnings or instructions "are disregarded," id., it does not suggest that sellers are entitled to have users successfully follow instructions no matter how difficult the task.

In sum, in light of the admissibility of Green's testimony concerning the inadequacy of the Mongoose's warnings, we conclude that Eskridge created a genuine factual issue concerning whether the Mongoose contained a use defect.

### III.

Eskridge also argues the district court erred in granting summary judgment on his claim for punitive damages. On this point, we disagree.

To prove entitlement to punitive damages, a plaintiff bears the burden of showing that the defendant acted in a manner that entitles him to such damages. See Peters v. Rivers Edge Mining, Inc., 680 S.E.2d 791, 821 (W. Va. 2009). "[T]he wrongful act must have been done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations." Id. (internal quotation marks omitted). In products liability cases, the plaintiff may justify a punitive damages award by showing that the manufacturer, having actual or constructive knowledge of the

25

product defect, continued to manufacture and distribute it. See Davis v. Celotex Corp., 420 S.E.2d 557, 559-61 (W. Va. 1992).

Eskridge has not forecasted evidence that could satisfy that standard here. Although the Mongoose featured an open-fork system, the record demonstrated that such a release had the benefit of allowing the user to remove the front wheel quickly and without tools. While Green testified that that benefit was not significant to casual riders, the popularity of the open-fork system on non-racing bicycles indicates otherwise. Especially considering that open-fork systems were so commonly employed in the industry, there was no reason to infer that the Defendants had actual or constructive knowledge that bicycles with such systems were inherently defective. Additionally, although Green opined that the Mongoose's particular open-fork system was defectively designed, such that it was significantly more dangerous than typical open-fork systems, there was no evidence that the Defendants had any actual or constructive knowledge of this difference. And finally, while Green testified that warning the consumer about the quick-release only in the owner's manual was not adequate, he conceded it was the manner in which most bicycle manufacturers and distributors conveyed that information. Although Green testified that some manufacturers and distributors took the more extensive measures that Green recommended, Eskridge presented no evidence that

26

Defendants had actual or constructive knowledge that their warnings were not sufficient. <u>See also</u> <u>Ilosky</u>, 307 S.E.2d at 619 (holding that trial court correctly struck punitive damages claim on failure-to-warn theory when defendant had taken steps to warn public of the danger in question and the only issue was whether these steps were adequate). We therefore affirm the grant of summary judgment concerning Eskridge's punitive damages claim.

## IV.

For the foregoing reasons, we reverse the grant of summary judgment on the issue of liability but affirm on Eskridge's claim for punitive damages. We therefore remand to the district court for trial.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

27