483 S.E.2d 48

**DIETER ENGINEERING SERVICES, INC., a Florida Corporation, Plaintiff Below, Appellee,**

v.

**PARKLAND DEVELOPMENT, INC., William Abruzzino, Rebecca Abruzzino, Center Designs, Inc., and Plaza Management, Inc., Defendants Below, Appellants.**

No. 23330.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1996.

Decided Dec. 16, 1996.

Gary E. Pullin, Cleek, Pullin, Knopf & Fowler, Charleston, for Appellants.

Peter G. Zurbuch, Busch & Talbott, L.C., Elkins, for Appellee.

McHUGH, Chief Justice:

The appellants, Parkland Development, Inc., William Abruzzino, Rebecca Abruzzino, Center Designs, Inc., and Plaza Management, Inc. appeal the July 24, 1995 order of the Circuit Court of Randolph County which denied their motion for entry of judgment notwithstanding the verdict, or in the alternative, motion for a new trial. The appellants filed these motions after the jury returned a verdict in favor of· the appellee, Dieter Engineering Services, Inc. (hereinafter "Dieter Engineering"), in the amount of $94,367.27. The case before us originated when Dieter Engineering, as a successor in interest, filed a breach of contract action against the appellants in which it alleged that the appellants had entered into a contract with Choctaw Engineering, Inc. d/b/a JAS–Orlando (hereinafter "Choctaw Engineering") for engineering services to be performed in conjunction with the construction

of a shopping center in Elkins, West Virginia and then failed to pay for the engineering services performed. For reasons explained below, we [1] affirm the July 24, 1995 order of the circuit court.

## I

Sometime in the late winter or spring of 1989 the appellant, Parkland Development, Inc. (hereinafter "Parkland") entered into a contract for civil engineering services with Choctaw Engineering to be performed in conjunction with the construction of the Valley Pointe Shopping Center in Elkins, West Virginia. At that time J. Stephen Dieter worked for and owned a partial interest in Choctaw Engineering. Moreover, he was the chief engineer who prepared the civil engineering plans for the Valley Pointe Shopping Center from Choctaw Engineering's offices in Orlando, Florida.

On June 30, 1990, Choctaw Engineering and J. Stephen Dieter entered into a transfer agreement whereby Dieter relinquished his interest in Choctaw Engineering. In return, Dieter received certain property and accounts, including the accounts receivable on the Valley Pointe Shopping Center project. Thereafter, J. Stephen Dieter continued working on the Valley Pointe Shopping Center project as Dieter Engineering.

On September 13, 1991, Dieter Engineering ceased working on the project because Parkland failed to make payment on outstanding invoices totaling $94,367.77. Dieter did not file a mechanic's lien because William Abruzzino, the chief executive officer (hereinafter "CEO") of Parkland, represented to him that the amount due would be paid when Abruzzino obtained additional financing. On December 26, 1991, after the limitations period expired in which the mechanic's lien must be filed and after Parkland failed to make payment on the outstanding invoices, Dieter Engineering filed an action for breach of contract in the Circuit Court of Randolph County.

Prior to trial the appellants filed a motion to dismiss the action pursuant to W. Va. Code, 31–1–66 [1974] on the basis that Dieter Engineering did not possess a certificate of authority issued by the secretary of state's office authorizing it to conduct business in West Virginia as is required by W. Va. Code, 31–1–49 [1979].[2] Neither Dieter Engineering nor Choctaw Engineering possessed a certificate of authority when performing the engineering services at the Valley Pointe Shopping Center. However, on the day of the hearing on appellants' motion to dismiss, a certificate of authority was faxed to Dieter Engineering. Based on the receipt of the certificate of authority, the circuit court denied the appellants' motion to dismiss.

At trial Dieter Engineering sought to prove that William and Rebecca Abruzzino, as shareholders of Parkland, Center Designs, Inc. and Plaza Management, Inc., were liable for Parkland's debts. Dieter Engineering also sought to prove that the successor corporations of Parkland, Center Designs, Inc. and Plaza Management, Inc., were liable for Parkland's debts. The circuit court at the close of the trial found that the corporate veils should be pierced and thus directed a verdict on the issue of shareholder liability and successor corporation liability in favor of Dieter Engineering.

On June 1, 1995, the jury returned a verdict for Dieter Engineering in the amount of $94,367.27. As noted above, the appellants appeal the circuit court's denial of their motion for entry of judgment notwithstanding

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

2. W. Va. Code, 31–1–49 [1979] states, in relevant part: "No foreign corporation shall have the right to conduct affairs or do or transact business in this State until it shall have procured a certificate of authority so to do [sic] from the secretary of state." As we will explain more fully later in this opinion, W. Va. Code, 31–1–66 [1974] prohibits a foreign corporation "which is conducting affairs or doing or transacting business in this State" from maintaining an action in any court in this State until the corporation obtains a certificate of authority.

the verdict, or in the alternative, motion for a new trial.

## II

The appellants maintain that the circuit court erred by refusing to dismiss the complaint pursuant to *W. Va.Code,* 31–1–66 [1974] on the basis that Dieter Engineering had not obtained a certificate of authority when the complaint was filed. *W. Va.Code,* 31–1–66 [1974] states, in relevant part:

No foreign corporation which is conducting affairs or doing or transacting business in this State without a certificate of authority shall be permitted to *maintain* any action or proceeding in any court of this State *until* such corporation shall have obtained a certificate of authority. Nor shall any action or proceeding be *maintained* in any court of this State by any successor or assignee of such corporation on any right, claim or demand arising out of the conducting of affairs or the doing or transacting of business by such corporation in this State, *until* a certificate of authority shall have been obtained by such corporation or by a corporation which has acquired all or substantially all of its assets.

(emphasis added). Conversely, Dieter Engineering asserts that although it did not have a certificate of authority when the action was initially filed, it may maintain the action because it obtained such certificate during the pendency of the action.

The primary issue to be resolved on this appeal is whether a foreign corporation must obtain a certificate of authority before instituting an action or whether the provisions of *W. Va.Code,* 33–1–66 [1974] authorize the foreign corporation to obtain the certificate after the institution of the action. The contention of the appellants and Dieter Engineering parallel the split of authority that exists among the jurisdictions which have interpreted statutes that prohibit foreign corporations from "maintaining" an action in their state courts "until" they have obtained a certificate of authority. *See generally* Annon., *Application of Statute Denying Access to Courts or Invalidating Contracts Where Corporation Fails to Comply with Regulatory Statute as Affected by Compliance After*

*Commencement of Action,* 23 ALR5th 744 at 765 § 2 (1994).

 We are mindful that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). *See also* syl. pt. 1, *In re the Petition of the City of Beckley to Annex, by Minor Boundary Adjustment, W. Va. Route 3 Right–of–Way Beginning at the Present Corporate Limits,* 194 W.Va. 423, 460 S.E.2d 669 (1995). Furthermore, if a statute is ambiguous, then this Court must resort to settled rules for construing a statute. *See Doran & Associates, Inc. v. Paige,* 195 W.Va. 115, 117, 464 S.E.2d 757, 759 (1995). In doing so, we must remember that

' " '[t]he primary object in construing a statute is to ascertain and give effect to the intent of the legislature.' Syl. Pt. 1, *Smith v. State Workmen's Compensation Comm.,* 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. Pt. 2, *State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984).' Syllabus point 2, *Lee v. West Virginia Teachers Retirement Board,* 186 W.Va. 441, 413 S.E.2d 96 (1991).

Syl. pt. 2, *Francis O. Day Co., Inc. v. Director, Division of Environmental Protection,* 191 W.Va. 134, 443 S.E.2d 602 (1994).

One rule of construction which is helpful in ascertaining the legislature's intent is that

'[g]enerally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use.' Syl. pt. 4, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars of the United States, a Corporation,* 144 W.Va. 137, 107 S.E.2d 353 (1959).

Syl. pt. 5, *State ex rel. Goff v. Merrifield,* 191 W.Va. 473, 446 S.E.2d 695 (1994). *See also Amick v. C & T Development Co., Inc.,* 187 W.Va. 115, 118, 416 S.E.2d 73, 76 (1992); *Pennsylvania and W. Va. Supply Corp. v. Rose,* 179 W.Va. 317, 319, 368 S.E.2d 101, 103 (1988). Our focus is on what the words "maintain" and "until" mean in *W. Va.Code,* 33–1–66 [1974]'s mandate that no foreign cor-

poration which is conducting affairs or doing or transacting business in this State shall be permitted to "maintain" an action in our state courts "until" the corporation obtains a certificate of authority.

*Webster's Third New International Dictionary* 1362 (1970) defines "maintain" as "to persevere in: carry on: keep up: continue[.]" This definition supports Dieter Engineering's argument that the word "maintain" means that a foreign corporation which is conducting affairs or doing or transacting business in this State may "continue" an action once the certificate of authority is obtained. However, the following definition of "maintain" in *Black's Law Dictionary* 953 (6th ed.1990) supports the appellants' argument that a foreign corporation which is doing or transacting business in this State may not "commence" or begin an action in our state courts until obtaining a certificate of authority: "**Maintain.** The term is variously defined as ... carry on; *commence; continue;* furnish means for subsistence or existence of; ... keep in existence or continuance; ... preserve from lapse[.]" (emphasis added). Although the word "maintain" may be construed to support either Dieter Engineering's or appellants' argument, we find it significant that both dictionaries use the word "continue" to define "maintain."

The word "until" is defined as "up to the time that: till such time as[.]" *Websters Third New International Dictionary* 2513 (1970). *See also Black's Law Dictionary* 1540 (6th ed. 1990) ("Up to time of."). The meaning of "until" provides an inference that a proceeding may be continued once a foreign corporation obtains a certificate of authority.

Moreover, the following language found in *W. Va.Code,* 33–1–66 [1974] indicates that the legislature primarily sought to compel foreign corporations which are conducting affairs or doing or transacting business in this State to pay all fees and taxes imposed by this State when it mandated that such corporations may not "maintain" an action in our state courts "until" they obtain a certificate of authority:

The failure of a foreign corporation to obtain a certificate of authority to conduct affairs or do or transact business in this State shall not impair the validity of any contract or act of such corporation, and shall not prevent such corporation from defending any action or proceeding in any court of this State.

A foreign corporation which conducts affairs or does or transacts business in this State without a certificate of authority shall be liable to this State, for the years or parts thereof during which it conducted affairs or did or transacted business in this State without a certificate of authority, in an amount equal to all fees and taxes which would have been imposed by this article, or by any other provisions of this Code, upon such corporation had it duly applied for and received a certificate of authority to conduct affairs or do or transact business in this State as required by this article and thereafter filed all reports, statements or returns required by this article or by any other provisions of this Code, plus all penalties imposed for failure to pay any such fees and taxes.

*W. Va.Code,* 31–1–66 [1974], in relevant part. Once the foreign corporation obtains a certificate of authority, thereby agreeing to pay all fees and taxes which would have been imposed upon the corporation had it duly obtained a certificate of authority as required by *W. Va.Code,* 31–1–49 [1979], *see* n. 2, *supra,* it would serve no purpose to prevent the foreign corporation from continuing an action already commenced in our state courts. Thus, based on all of the above, we conclude that the legislature intended *W. Va.Code,* 31–1–66 [1974] to permit a foreign corporation which is conducting affairs or doing or transacting business in this State to continue an action in our state courts once it obtains a certificate of authority even if the corporation did not possess such certificate when initiating the action.

Our interpretation of *W. Va.Code,* 31–1–66 [1974] is in accord with the majority of jurisdictions which have construed statutes which prohibit foreign corporations from "maintaining" an action in their state courts "until" the corporation obtains a certificate of authority. For instance, in *Hudson Farms, Inc. v. McGrellis,* 620 A.2d 215 (Del.1993), the Su-

preme Court of Delaware was confronted with construing the meaning of *Del.Code Ann.* tit. 8, § 383 (1991), which states, in pertinent part:

A foreign corporation ... which has done business in this State without authority shall not maintain any action or special proceeding in this State unless and until such corporation has been authorized to do business in this State and has paid to the State all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this State without authority.

The Supreme Court of Delaware held that "[b]ecause we perceive a clear legislative intent to encourage the payment of taxes attributable to previous unauthorized activities we are inclined to an interpretation of the states which permit a period of compliance after commencement of litigation." *Hudson Farms, Inc,* 620 A.2d at 221. Before arriving at its conclusion the Supreme Court of Delaware noted that "[t]he great majority of courts which have construed such statutes have concluded that a court may stay a suit commenced by a non-qualified foreign corporation until the foreign corporation obtains the requisite authority." *Id.* at 218. *See also Cost of Wisconsin, Inc. v. Shaw,* 292 S.C. 435, 357 S.E.2d 20 (1987); *Video Engineering Co., Inc. v. Foto–Video Electronics, Inc.,* 207 Va. 1027, 154 S.E.2d 7 (1967); Annon., *Application of Statute Denying Access to Courts or Invalidating Contracts Where Corporation Fails to Comply with Regulatory Statute as Affected by Compliance After Commencement of Action,* 23 ALR5th 744 at 765 § 2 (1994); 19 Am.Jur.2d *Corporations* § 2171 (1986); 36 Am.Jur.2d *Foreign Corporations* § 302 (1968). *But see P.K. Springfield, Inc. v. Hogan,* 86 Ohio App.3d 764, 621 N.E.2d 1253 (1993) (The Court of Appeals of Ohio held that a foreign corporation that fails to obtain a license prior to filing a suit may not cure the violation by later obtaining the license—the license must be filed prior to the

initiation of the suit); *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 93 Nev. 270, 563 P.2d 582 (1977) (The wording of Nevada's statute is different than West Virginia's in that NRS 80.210 provides that a foreign corporation "shall not be allowed to *commence,* maintain, or defend any action or proceeding in any court of this state until ..." it obtains a certificate of authority (emphasis added)).[3]

■ Accordingly, we hold that pursuant to *W. Va.Code,* 31–1–66 [1974] which states, in relevant part, that "[n]o foreign corporation which is conducting affairs or doing or transacting business in this State without a certificate of authority shall be permitted to *maintain* any action or proceeding in any court of this State *until* such corporation shall have obtained a certificate of authority[,]" such corporation may maintain an action or proceeding in any court in this State when the corporation obtains a certificate of authority even though the corporation did not have the certificate at the time it instituted the action or proceeding. In the case before us, the circuit court did not err by refusing to dismiss the complaint pursuant to *W. Va.Code,* 31–1–66 [1974] because Dieter Engineering obtained a certificate of authority during the pendency of the proceeding.

### III

■ The appellants also assign as error the circuit court's ruling which prevented appellants from arguing before the jury that the assignment from Choctaw Engineering to Dieter Engineering of the Parkland accounts receivable was not effective. The circuit court granted Dieter Engineering's motion for a partial summary judgment in a January 19, 1994 order by holding that the assignment effectively transferred to Dieter Engineering the accounts receivable owed to Choctaw Engineering by Parkland. We note that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d

**3.** The appellants rely on *Penberthy Electromelt Co. v. Star City Glass Co.,* 148 W.Va. 419, 135 S.E.2d 289 (1964) to support their argument. We find this reliance to be misplaced. In *Penberthy* this Court held that pursuant to the code section which predated *W. Va.Code,* 31–1–66

[1974] the plaintiff foreign corporation could not maintain a suit because it had *never qualified to do business in this State. Id.* Thus, *Penberthy* did not address the issue that is before us in the case at bar.

755 (1994). *See also* syl. pt. 1, *Hose v. Berkeley County Planning Com'n*, 194 W.Va. 515, 460 S.E.2d 761 (1995).[4] We are mindful that

> ' "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

Syl. pt. 2, *Painter, supra. See also* syl. pt. 2, *Hose, supra; W. Va. R. Civ. P.* 56.

■ We held in syllabus point 4 of *Randolph v. The Koury Corp.*, 173 W.Va. 96, 312 S.E.2d 759 (1984) that "[w]here a party has a contractual obligation, he, as the obligor, may not escape performance when the other party, the assignor, has assigned the contract

right to a third party, the assignee, by pointing to some defect in the assignment, unless such defect renders the assignment void." [5] As explained in 6 Am.Jur.2d *Assignment* § 102 (1963), "the obligor may not defend on any ground which renders the assignment voidable only, such as fraud or undue influence, nor can he interpose the defense of lack of consideration or that the assignee occupied a fiduciary relationship to the assignor." (footnote omitted). *See also Randolph*, 173 W.Va. at 100, 312 S.E.2d at 764. The purpose of allowing the obligor to raise as a defense that the assignment is void is to insure that he or she will not have to pay the same claim twice. *See Randolph, supra.* With this in mind, we now examine the parties' arguments.

■ In their brief the appellants argue that two facts make the assignment of the Parkland accounts receivable from Choctaw Engineering to Dieter Engineering void. First, the appellants contend that the trans-

---

4. The appellants framed the above issue in the following manner: "The trial court erred in granting ... [Dieter Engineering's] first motion in limine prohibiting appellants from inquiring into and arguing about the lack of an effective assignment from Choctaw Engineering, Inc., to ... [Dieter Engineering] of the accounts payable of ... [Parkland]." The reason the circuit court granted Dieter Engineering's motion in limine is because, as noted above, it had already held that the assignment was effective when it entered partial summary judgment in favor of Dieter Engineering on January 19, 1994. Thus, we find that the appellants' real complaint is that the circuit court entered summary judgment on this issue.

5. We note that an unsettled account or debt is a chose in action which is assignable. *See W. Va.Code*, 55-8-9 [1923] (States, in relevant part, that an assignee of any note, account or chose in action arising out of contract may maintain in his or her own name the chose of action the original owner of such chose of action might have brought). The appellants assert that because Choctaw Engineering did not obtain a certificate of authority, it would have been barred from bringing an action against Parkland for breach of contract pursuant to *W. Va.Code*, 31-1-66 [1974]. Thus, the appellants conclude that Choctaw Engineering could not assign the right to bring an action against Parkland because it did not have the right to bring such an action in the first instance. We find that the clear

language of *W. Va.Code*, 31-1-66 [1974], in pertinent part, states otherwise:

> No foreign corporation which is conducting affairs or doing or transacting business in this State without a certificate of authority shall be permitted to maintain any action or proceeding in any court of this State until such corporation shall have obtained a certificate of authority. *Nor shall any action or proceeding be maintained* in any court of this State *by any successor or assignee of such corporation* on any right, claim or demand arising out of the conducting of affairs or the doing or transacting of business by such corporation in this State, *until a certificate of authority shall have been obtained* by such corporation or *by a corporation which has acquired all or substantially all of its assets.*

(emphasis added).

The above language expressly allows a successor or assignee of a corporation, who has acquired substantially all of the corporation's assets, to maintain an action "on any right, claim or demand arising out of the conducting of affairs or the doing or transacting of business" of the corporation once the successor or assignee obtains a certificate of authority. Dieter Engineering acquired substantially all of Choctaw Engineering's assets in the Choctaw–JAS–Orlando's offices. Thus, once Dieter Engineering obtained a certificate of authority it could maintain the proceeding against Parkland as a successor in interest pursuant to the above language in *W. Va.Code*, 31-1-66 [1974]. Therefore, we find this contention of the appellants to be without merit.

fer agreement [6] does not include the Parkland accounts receivable; thus, there could be no assignment of the Parkland accounts receivable to Dieter Engineering. Secondly, the appellants argue that because Dieter Engineering was not in existence until August 23, 1990, it would have been impossible for Dieter Engineering to take assignment of the Parkland accounts receivable because it was not in existence when the transfer agreement was signed on June 30, 1990.

Conversely, Dieter Engineering notes that the agreement specifically provided that Choctaw Engineering would transfer to Dieter Engineering "Accounts Receivable of Choctaw's Orlando office, whether due or past due and work-in-process not yet billed to clients." The Valley Pointe Shopping Center project was an account of Choctaw–JAS–Orlando's offices. Furthermore, Dieter Engineering maintains that although it was not in existence until August 23, 1990, the transfer agreement clearly stated that it would be receiving the accounts receivable of Choctaw–JAS–Orlando's offices: "Choctaw will cause Newco to be organized as a Florida corporation having articles of incorporation, bylaws and organizational minutes in a form approved by counsel for Dieter. The corporate name of Newco shall be Dieter Engineering Services, Inc., or such name as shall be approved by Dieter." Therefore, Dieter Engineering concludes that the appellants have brought forth no evidence which indicates that the assignment between Choctaw Engineering and Dieter Engineering was void.

We agree with Dieter Engineering. Accordingly, we hold that the circuit court did not err by granting partial summary judgment in favor of Dieter Engineering.[7]

### IV

■ The appellants argue that the circuit court erred by directing a verdict in favor of piercing the corporate veil of Parkland, Plaza Management and Center Designs and holding the individual shareholders, William and Rebecca Abruzzino, personally liable for the debt owed Dieter Engineering. At the outset, we note that syllabus point 3 of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996) sets forth the standard by which this Court reviews a circuit court's granting of a motion for a directed verdict:

> The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to nonmovant party, will sustain the granting of directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed.

The relationship between Parkland, Plaza Management, Center Designs, and William and Rebecca Abruzzino is important. The record reveals that Parkland was specifically set up to develop the Valley Point Shopping Center project. The shareholders and board of directors for Parkland were William and Rebecca Abruzzino. An unnamed attorney was also on Parkland's board of directors. William Abruzzino was the CEO and his wife,

---

6. The transfer agreement document is titled "Transfer of Orlando Division of Choctaw Engineering, Inc. to J. Stephen Dieter Effective June 30, 1990." For purposes of this opinion, we will simply refer to this document as "the transfer agreement."

7. The appellants also assert that section 7(d) of the transfer agreement states that only Choctaw Engineering could bring suit. Section 7(d) provides:

> At the request of Newco or Dieter, Choctaw will prosecute or otherwise enforce in its own name for the benefit of Newco, and at Newco's expense, any and all claims or rights in the

name of Choctaw, which, or the benefits of which are transferred to Newco pursuant to this Agreement and which are required to be prosecuted or otherwise enforced in Choctaw's name.

We agree with Dieter Engineering's assertion that the above language in section 7(d) does not provide that suit may only be filed in Choctaw's name. Instead, the above language in 7(d) merely provides that if for some reason a suit is required to be prosecuted in Choctaw's name, then Choctaw must prosecute the suit. Accordingly, we find this argument of the appellants' to be without merit.

Rebecca, was the secretary of the corporation. Parkland did not have any employees nor did it pay any salaries.

Center Designs, which is owned by Rebecca Abruzzino, also develops shopping centers. William Abruzzino is the CEO of Center Designs. Rebecca is the corporate secretary of Center Designs. At some point Parkland deeded the property on which the Valley Pointe Shopping Center is located to Center Designs. Moreover, when Parkland could not service its debt, Center Designs assumed responsibility for Parkland's loans.

Plaza Management manages, but does not own the various shopping centers owned by William and Rebecca Abruzzino and some of their other corporations. William Abruzzino is the CEO of Plaza Management. Rebecca Abruzzino is the corporate secretary and owns Plaza Management. Plaza Management made interest payments for Parkland when Parkland could not service its debt until Center Designs assumed Parkland's loans. Parkland, Center Designs, and Plaza Management were all operated out of Rebecca Abruzzino's home in Atlanta, Georgia.[8]

■ Generally, individual stockholders are not responsible for the debts of a corporation because a corporation is an entity separate and distinct from the people who own it. *See W. Va.Code,* 31–1–89 [1974].[9] *See also Laya v. Erin Homes, Inc.,* 177 W.Va. 343, 346, 352 S.E.2d 93, 97 (1986). However, this concept is a fiction of law which "should be disregarded when it is urged with an intent not within its reason and purpose, and in such a way that its retention would produce injustices or inequitable consequences." Syl. pt. 10, in part,

*Sanders v. Roselawn Memorial Gardens,* 152 W.Va. 91, 159 S.E.2d 784 (1968). *See also Laya,* 177 W.Va. at 347, 352 S.E.2d at 97–98. This Court more recently held that "[t]he corporate entity may be disregarded in those situations where the corporate form is being used to perpetrate injustice, defeat public convenience, or justify wrongful or inequitable conduct." Syl. pt. 3, *Mills v. USA Mobile Communications, Inc.,* 190 W.Va. 209, 438 S.E.2d 1 (1993).

■ In *Laya* this Court made clear that the "propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the evidence." *Laya,* 177 W.Va. at 351, 352 S.E.2d at 102. Normally, there is a two-prong test which must be applied when determining whether the corporate veil should be pierced in cases involving an alleged breach of contract:

> In a case involving an alleged breach of contract, to 'pierce the corporate veil' in order to hold the shareholder(s) actively participating in the operation of the business personally liable for such breach to the party who entered into the contract with the corporation, there is normally a two-prong test: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement).

**8.** At some point during the pendency of this action, the Abruzzinos moved from Atlanta, Georgia to Florida.

**9.** This Court noted in *Mills v. USA Mobile Communications, Inc.,* 190 W.Va. 209, 212, 438 S.E.2d 1, 4 (1993) that "[a]lthough stockholders were not immune from liability for corporate obligations at common law, such insulation has been the cornerstone of corporate law since the nineteenth century, and virtually every state now has a statute limiting a stockholder's liability to the cost of the shares held." *(citing* 18A Am. Jur.2d *Corporations* § 850 (1985 & Supp.1993)). *W. Va.Code,* 31–1–89 [1974] is West Virginia's statute limiting a shareholder's liability to the

cost of the shares held: "A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay the corporation the full consideration for which such shares were issued or to be issued." (in relevant part).

Additionally, article XI, § 2 of the *Constitution of West Virginia* provides: "The stockholders of all corporations and joint stock companies, except banks and banking institutions, created by laws of this State, shall be liable for the indebtedness of such corporations to the amount of their stock subscribed and unpaid, and no more."

Syl. pt. 3, *Laya, supra.* When applying the two-prong test, there are numerous factors which should be considered when deciding whether to pierce the corporate veil. *Laya,* 177 W.Va. at 347–48, 352 S.E.2d at 98–99, identifies nineteen such factors.[10]

Our review of the record in the case before us indicates that the circuit court utilized the two-prong test set forth in syllabus point 3 of *Laya, supra,* by applying the nineteen factors listed in *Laya* to the evidence presented at trial.[11] Thus, this Court in reviewing the circuit court's decision to direct a verdict will examine the evidence presented at trial in the light most favorable to the appellants in order to determine whether the only reasonable conclusion as to the verdict is that the corporate veil should be pierced. *See* syl. pt. 1, *Brannon, supra.*

**10.** The nineteen factors set forth in *Laya,* 177 W.Va. at 347–48, 352 S.E.2d at 98–99, are:

(1) commingling of funds and other assets of the corporation with those of the individual shareholders;

(2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);

(3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors;

(4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;

(5) failure to maintain corporate minutes or adequate corporate records;

(6) identical equitable ownership in two entities;

(7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);

(8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;

(9) absence of separately held corporate assets;

(10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;

(11) sole ownership of all the stock by one individual or members of single family;

(12) use of the same office or business location by the corporation and its individual shareholder(s);

The record reveals that there was very little evidence indicating that the appellants failed to maintain corporate formalities, factor 3 of *Laya, supra,* or failed to maintain corporate minutes or adequate records, factor 5 of *Laya.* Thus, the evidence does not support construing factors 3 and 5 in favor of piercing the corporate veil. Furthermore, the evidence reveals that factor 16, the use of a corporate entity as a conduit to procure labor, services or merchandise to another person or entity, should not be construed in favor of piercing the corporate veil because there was no evidence that Parkland was used as a conduit to procure labor services or merchandise for another person or entity. Thus, an examination of the evidence in the light most favorable to the appellants reveals that three of the nineteen factors listed in *Laya, supra,* do not support piercing the corporate veil.

(13) employment of the same employees or attorney by the corporation and its shareholder(s);

(14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security);

(15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;

(16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;

(17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;

(18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions;

(19) the formation and use of the corporation to assume the existing liabilities of another person or entity.

(footnote omitted).

**11.** The circuit court, relying on syllabus point 3 of *Davis v. Celotex Corp.,* 187 W.Va. 566, 420 S.E.2d 557 (1992), also directed a verdict on successor corporation liability. None of the parties argue that the circuit court improperly directed a verdict on this issue. Therefore, this Court will not address this issue on appeal.

However, our review of the record indicates that fifteen of the nineteen factors listed in *Laya, supra,* should be construed in favor of piercing the corporate veil. For instance, the circuit court held that factors 1 and 2, the co-mingling of funds of the corporation with those of the individual shareholders and the diversion of the corporation's funds or assets to noncorporate uses, were to be construed in favor of piercing the corporate veil because the appellants would not produce Rebecca Abruzzino's personal tax returns and financial statements. Because the circuit court gave the appellants the opportunity to produce these documents, we find the circuit court's determination that factors 1 and 2 would be construed as piercing the corporate veil if the documents were not produced by the appellants to be a sound ruling. *See W. Va. R. Civ. P.* 37(b)(2)(A) and 37(d) (If a party fails to answer a discovery question after being ordered to do so by the circuit court, the circuit court may rule "that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order . . .").

Likewise, the evidence presented on factor 4, that is, an individual shareholder represents he is personally liable for debts of the corporation, supports piercing the corporate veil. William Abruzzino testified that he and his wife, Rebecca, personally guaranteed over one million dollars in loans for the Valley Pointe Shopping Center project. In fact, Rebecca Abruzzino used her home in Atlanta, Georgia as collateral to secure one of the loans made to Parkland.

The evidence regarding factors 6, 7, and 11 (identical equitable ownership in two entities, identity of directors and officers of two entities are the same, and sole ownership of all the stock by one individual or members of a single family, respectively) support piercing the corporate veil. The testimony of William Abruzzino revealed that Rebecca Abruzzino is the sole owner of Parkland, Plaza Management, and Center Designs. Moreover, William Abruzzino stated that he and his wife, Rebecca, are on the Board of Directors of all of the above corporations.

The evidence at trial further revealed that the $1000.00 capitalization of Parkland was clearly inadequate given that the Valley Point Shopping Center project cost approximately $1,212,000.00 and that loans were obtained for the project in the amount of approximately $1,220,000.00. Thus, there is evidence of factor 8, the failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking, which supports piercing the corporate veil. In *Laya* we made clear that this was one of the most significant factors of all of the nineteen factors in determining whether the corporate veil should be pierced. *Laya,* 177 W.Va. at 350, 352 S.E.2d at 101.

Factor 10 is the use of a corporation as a mere shell to operate a single venture of another corporation. William Abruzzino testified that the sole purpose for creating Parkland was to develop the Valley Pointe Shopping Center and that the sole purpose of Plaza Management was to manage the shopping center once it was built. William Abruzzino's testimony indicates that Parkland was a mere shell for carrying out the venture of Plaza Management. Thus, the evidence on factor 10 should be construed in favor of piercing the corporate veil.

Factors 12 and 13 are the use of the same office or business location by the corporation and its individual shareholders and the employment of the same employees or attorney by the corporation and its shareholders, respectively. As previously stated, William Abruzzino indicated that all of the corporations, Parkland, Center Designs and Plaza Management, were operated out of Rebecca Abruzzino's home in Atlanta, Georgia. Moreover, the law firm of Jory & Smith represented all appellants at the trial of the underlying actions. On appeal, Gary E. Pullin represents all of the appellants. Additionally, William Abruzzino was the CEO of all of the corporations and Rebecca Abruzzino was the corporate secretary of all of the corporations. Thus, the evidence on factors 12 and 13 support piercing the corporate veil.

Factors 14, 15, 17, 18, and 19 are, respectively, the concealment of identity of ownership or financial interests of the corporation or concealment of personal business activities

of the shareholders, the disregard of legal formalities and the failure to maintain proper arm's length relationship among related entities, the diversion of corporate assets from the corporation to another entity to the detriment of the creditors, the contracting by the corporation with another person with intent to avoid the risk of nonperformance by use of the corporate entity, and the formation and the use of the corporation to assume the existing liabilities of another person or entity. As we have previously noted, the appellants refused to produce Rebecca Abruzzino's personal tax returns or financial statements giving the appearance of concealing the ownership or financial interests of Rebecca Abruzzino in the corporations. Furthermore, the evidence at trial revealed that Plaza Management paid the debt service on the loans for the Valley Pointe Shopping Center for Parkland in order to protect Rebecca Abruzzino's Georgia home which secured a loan of $330,000.00 made to Parkland. Rebecca had personally taken out this $330,000.00 loan in order to help finance the Valley Pointe Shopping Center project. Center Designs later assumed the responsibility of paying the loans. Dieter Engineering asserts that because neither Plaza Management nor Center Designs would pay Dieter Engineering, it is clear that the Abruzzinos deliberately intended to divert corporate assets and income for the benefit of their other closely held corporations. We find that the evidence on factors 14, 15, 17, 18, and 19 support piercing the corporate veil.

Thus, after "[e]xamination of the numerous relevant factors in a 'totality of the circumstances' test" we find that after examining the evidence in the light most favorable to the appellants, that the only reasonable conclusion as to the verdict is that the corporate veil should be pierced. *Quoting Laya,* 177 W.Va. at 348, 352 S.E.2d at 99. Accordingly, the circuit court did not err when granting a directed verdict on the issue of shareholder liability in favor of Dieter Engineering.[12]

**V**

The appellants raise as an assignment of error that the circuit court erred in awarding pre-judgment interest after the jury returned its verdict. The appellants base their argument on *W. Va.Code,* 56–6–27 [1923] which states:

> *The jury,* in any action founded on contract, may allow interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments and set-offs; and judgment shall be entered for such aggregate with interest from the date of the verdict.

(emphasis added). The appellants maintain that the above statute clearly states that only the jury may award pre-judgment interest.

In the case before us, the jury verdict form did not allow for the jury to award pre-judgment interest. During deliberations, the jury submitted the following written question to the circuit court: "Can we consider awarding interest on settlement?" Although there is no record of this, Dieter Engineering represents in its brief that the circuit court upon receiving the question from the jury conferred with the parties in chambers where it was agreed by all to answer the jury's question in the negative and that the circuit court would award interest on any principal sum returned by the jury. The circuit court then made the following written answer in response to the jury's question: "No, the court will award interest based on your verdict."

The appellants do not disagree with Dieter Engineering's representation of the above facts. Furthermore, not only did the appellants fail to object on the record to how the circuit court chose to answer the question submitted by the jury during deliberations, but the appellants agreed to the answer the circuit court provided to the jury. Thus, we find the appellants waived any error by failing to object to the circuit court's response to the jury's question: "Where objections were

---

**12.** Dieter Engineering raises as a cross-assignment of error that the circuit court erred when it refused to grant its motion for summary judgment on the issue of piercing the corporate veil. However, because we upheld the circuit court's entry of a directed verdict in favor of Dieter Engineering on this issue, we will not address Dieter Engineering's cross-assignment of error.

not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syl. pt. 1, *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964). *See also O'Neal v. Peake Operating Co.,* 185 W.Va. 28, 404 S.E.2d 420 (1991). *Cf.* syl. pt. 3, *In the Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981) (" 'An order to which no objection was made and which was actually approved by counsel, will not be reviewed on appeal.' Syl. pt. 1, *Loar v. Massey,* [164 W.Va. 155], 261 S.E.2d 83 (1979)."); *Tennant v. Marion Health Care Foundation, Inc.* 194 W.Va. 97, 114, 459 S.E.2d 374, 391 (1995) ("[T]he party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record for meaningful appellate review."). Accordingly, we will not further address this assignment of error.

## VI

In summary, this Court concludes that the circuit court correctly ruled pursuant to *W. Va. Code,* 31-1-66 [1974] that the breach of contract action filed by Dieter Engineering should not be dismissed because Dieter Engineering obtained a certificate of authority during the pendency of the action. Additionally, in that the appellants provided no evidence pointing to some defect in the assignment of rights between Choctaw Engineering and Dieter Engineering which would render the assignment void, we find that the circuit court correctly held that the assignment was effective. Lastly, we hold that the circuit court properly directed a verdict on the issue of shareholder liability.

Accordingly, we affirm the July 24, 1995 order of the Circuit Court of Randolph County.

Affirmed.

RECHT J., sitting by temporary assignment.