**CARTER ENTERPRISES, INC., Plaintiff,**

v.

**ASHLAND SPECIALTY CO., INC., Defendant.**

Civ.A. No. 3:00–00294.
Bankruptcy No. 98–30281.
Adversary No. 99–0154.

United States District Court,
S.D. West Virginia,
Huntington Division.

Jan. 31, 2001.

William D. Levine, St. Clair & Levine, Huntington, WV, for appellant.

J. Grant McGuire, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, WV, for appellee.

## ORDER

CHAMBERS, District Judge.

This case is an appeal from the denial by the bankruptcy judge of Appellant's objections to Appellee's proof of claim and the February 17, 2000 judgment order of the bankruptcy court. The Court disposes with oral argument because the facts and legal arguments are adequately presented in the briefs and in the record, and the decisional process would not be significantly aided by oral argument. *See* FED. R.BANKR.P. Rule 8012. For the reasons set forth below, the Court **AFFIRMS** the judgment order of the bankruptcy court.

### I. Factual and Procedural Background

Before July 1996, Greg Carter owned and operated as a sole proprietorship three retail stores in the Huntington, West Virginia, area (denominated in the record as Tobacco Huts #1, #2, and #3). Through July 1996, the sole proprietorship purchased inventory from Appellee Ashland Specialty Company (Ashland). Evidence in the record is that on June 30, 1996, at the ostensible end of the sole proprietorship, Carter owed Ashland $426,744.41 for unpaid purchases.[1] (Ex. B.)

In March 1996, Carter incorporated as Carter Enterprises, Inc. (Appellant). On July 1, 1996, this corporation began operation of those same stores. Thereafter, from July 1996 through 1998, Carter Enterprises, Inc., continued to purchase inventory from Ashland. Appellant introduced evidence that during this period, it purchased $1,777,049.34 worth of goods from Ashland (Tr. at 18 & 24; Ex. 1) and paid to Ashland $1,763.866.22 (Tr. at 18; Ex. 1). Throughout the period of 1996 to 1998, Ashland continued to make payment demands from Carter Enterprises, Inc., for amounts due from both pre- and post-incorporation sales, demands which Appellant made no effort to dispute. Furthermore, Ashland asserts that it was unaware of Carter's incorporation.

Unable to resolve the Carter account, Ashland filed a petition for involuntary bankruptcy on April 10, 1998. *See In re Carter Enter., Inc.*, No. 98–30281. On June 4, 1998, the bankruptcy judge converted the case from Chapter 7 to Chapter 11. Appellant filed its objection to Appellee's proof of claim on July 2, 1999, and the bankruptcy court converted the same to adversary proceeding number 99–0154 on December 9, 1999. A hearing was held before the bankruptcy judge on February 3, 2000. On February 17, 2000, the bankruptcy court entered a judgment order, denying Appellant's objections and finding that Appellee has a valid, unsecured claim of $348,542.73. Appellant filed its notice of appeal from that judgment order on April 14, 2000.

### II. Legal Analysis

#### A. Jurisdiction and Standard of Review

■ This Court has jurisdiction pursuant to 28 U.S.C. §§ 158 & 1334 and FED. R.BANKR.P. 8001. In an appeal from a bankruptcy court, a district court may not

---

1. The figure $418,966 was used during the hearing before the bankruptcy judge. (R. at 86.) This figure was apparently erroneously calculated by using $133,364.21, the amount due for the store known as "Tobacco Hut #2" on 05/31/1996, which appears at the bottom of the first page of Exhibit B–2, instead of the correct amount, as stated during the hearing, of $141,140.74.

set aside the bankruptcy judge's findings of fact unless those findings are clearly erroneous. *See* FED.R.BANKR.P. 8013;[2] *In re Bryson Prop., XVIII,* 961 F.2d 496, 499 (4th Cir.1992); *In re Johnson,* 960 F.2d 396, 399 (4th Cir.1992). " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). A bankruptcy court's conclusions of law are reviewed *de novo. See In re Johnson, supra.* Mixed question of fact and law are typically reviewed *de novo. See Rinn v. First Union Nat. Bank of Md.,* 176 B.R. 401 (D.Md.1995) ("Mixed questions of fact and law which contain 'primarily a consideration of legal principles' are considered *de novo.*" (quoting *In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir.1988))); *In re Grimm,* 156 B.R. 958 (E.D.Va.1993) (citing *In re McWhorter,* 887 F.2d 1564 (11th Cir.1989) (mixed questions of law and fact in which legal issues prevail are reviewed *de novo*)).

### B. Burdens of Proof and Persuasion

■ A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy constitutes prima facie evidence of the validity and amount of that claim. FED.R.BANKR.P. 3001(f); *see* 11 U.S.C. §§ 501(a), 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects."). Such a proof of claim is some evidence and will suffice to overcome a mere formal objec-

tion without more. Thus, where a debtor objects to such a claim, the burden of proof falls on the objecting debtor. The ultimate burden of persuasion by a preponderance of the evidence, however, at all times remains with the creditor. *See, e.g., In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992) ("In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."); *Wright v. Holm (In re Holm),* 931 F.2d 620, 623 (9th Cir.1991) ("Should objection be taken, the objector is then called upon to produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves. But the ultimate burden of persuasion is always on the claimant." (quoting 3 L. KING, COLLIER ON BANKRUPTCY § 502.02, at 502–22 (15th ed.1991) (footnotes omitted))); *In re Fidelity, Holding Co., Ltd.,* 837 F.2d 696 (5th Cir.1988).

### C. Issues on Appeal

#### 1. Successor Liability

The first issue on appeal is whether the bankruptcy judge erred in finding successor liability, *i.e.,* in holding Carter Enterprises, Inc., liable for debts previously incurred by Greg Carter, the sole proprietorship, doing business as Carter Enterprises. This issue presents a mixed question of fact and law; therefore, this Court will review the decision of the bankruptcy judge *de novo.*

■ It is important to state at the outset what this case is *not* about: This case is *not* about corporate veil-piercing, or even about reverse corporate veil-piercing.[3] Notwithstanding allegations to the

**2.** Rule 8013 provides:

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

**3.** "While a classical piercing renders a shareholder responsible for the actions of the corporation, in a 'reverse' piercing, assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate

contrary, the bankruptcy judge did *not* find that "Carter Enterprises was liable for the debts of its stockholder" (Br. of Appellant at 3), or "that since Ashland did not know about the change [from sole proprietorship to corporation], the corporate debtor was liable for the obligations of its stockholders" (Br. of Appellant at 6). (*See, e.g.,* Tr. at 137.1 to 138.10.) Successor liability, relied upon by the bankruptcy judge and by this Court, and corporate veil-piercing, while based on many overlapping factors, are separate legal doctrines with distinct legal consequences.

■ Piercing the corporate veil to hold a corporation's owner responsible for the corporation's liabilities (or its reverse counterpart, where that cause of action has been recognized) involves examination of the relationship between the corporation and its owner and the degree to which the corporation observes, *vel non,* the formalities required of it by the state. If a court finds that such a blurring of the line between the corporation and its owner exists and that equity demands it, the court's conclusion will be that the two are legally one, *i.e.,* that what appears to be two entities existing in parallel is, for certain purposes, a single entity. *See, e.g.,* syl. pt. 9, *Dieter Eng'g Serv., Inc. v. Parkland Dev., Inc.,* 199 W.Va. 48, 483 S.E.2d 48 (1996) (holding that in breach of contract case, two-prong test to pierce corporate veil demands that "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement)." (quoting syl. pt. 3, *Laya v. Erin Homes, Inc.,* 177 W.Va. 343, 352 S.E.2d 93 (1986))).

■ Successor liability, on the other hand, involves an examination of the relationship between an entity that existed for

one period of time and an (allegedly different) entity that existed for a subsequent period of time. Unlike its veil-piercing cousin, successor liability does not speak to an existing relationship between the corporation and its current owner, but to the relationship between the corporation and its predecessor, whether such predecessor happens to be the current owner (for example, in the case where, like here, the predecessor was an individual operating as a sole proprietor who then incorporated), another corporation (in the case of a reorganization), or two or more other corporations (in the case of a merger). Accordingly, the corporate veil-piercing cases from within and without West Virginia cited by the parties are inapposite.

■ In this bankruptcy appeal, successor liability is a question of state law. *See Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, ——, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. The basic federal rule in bankruptcy is that state law governs the substance of claims.... Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.") (internal quotations and citations omitted) (quoting *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161–162, 67 S.Ct. 237, 91 L.Ed. 162 (1946)).

■ To determine which state's law to apply, this Court employs West Virginia's choice of law principles in bankruptcy appeals. *See In re Merritt Dredging Co.,* 839 F.2d 203, 206 (4th Cir.1988) (holding that rule from *Klaxon Co. v. Stentor Elec.*

entity and the individual will be considered one and the same." *In re Blatstein,* 192 F.3d

88, 100 (3d Cir.1999) (internal quotations and citation omitted).

*Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that federal court sitting in diversity must apply choice of law rules of state in which it sits) also applies in federal bankruptcy cases). In West Virginia, successor liability is analyzed under the law of the transferee corporation's state of incorporation. *See State ex rel. Elish v. Wilson*, 189 W.Va. 739, 434 S.E.2d 411, 416 (1993) (adopting, for issues involving the rights and liabilities of a corporation, "general rule regarding choice of law requir[ing] that the substantive law of the place of incorporation is to be applied unless another state has a more substantial connection or the application of the other state's law would be contrary to our public policy."). *Cf. Savage Arms, Inc. v. Western Auto Supply Co.*, 18 P.3d 49, at 53 nn. 14 & 15 (Alaska 2000) (cataloguing various federal and state approaches to choice of law in successor liability cases). Appellant cites West Virginia case law, and the evidence implies that Appellant existed and operated as a West Virginia entity. Accordingly, West Virginia's successor liability law applies.

In West Virginia, as in most jurisdictions, "[a]t common law, the purchaser of all the assets of a corporation was not liable for the debts or liabilities of the corporation purchased. This rule has since been tempered by a number of exceptions and statutory provisions." Syl. pt. 2, *Davis v. Celotex Corp.*, 187 W.Va. 566, 420 S.E.2d 557 (1992). The exception relevant to the instant case is successor liability:

> A successor corporation can be liable for the debts and obligations of a predecessor corporation if there was an express or implied assumption of liability, if the transaction was fraudulent, or if some element of the transaction was not made in good faith. Successor liability will also attach in a consolidation or merger.... Finally, such liability will also result where the successor corporation is a mere continuation or reincarnation of its predecessor.

Syl. pt. 3, *Davis*.[4] In the instant case, the decision of the bankruptcy judge to find

**4.** The holding in *Davis* applies by its terms to corporation-follows-corporation successorship. The Court finds no reason, however, to believe that West Virginia would not extend the logic to the circumstances of the case at bar, involving corporation-follows-sole-proprietorship successorship. *See, e.g., Graham v. James*, 144 F.3d 229, 240 (2d Cir.1998) (applying New York state and federal corporation law materially equivalent to West Virginia law and acknowledging that corporation-follows-sole-proprietorship may support finding of successor liability); *Firkin v. U.S. Polychemical Corp.*, 835 F.Supp. 1048 (N.D.Ill.1993). After noting that "[n]ot surprisingly, there is little case law on this issue," *id.* at 1051, the *Firkin* court wrote:

> In *Plaza Express Co. v. Middle States Motor Freight, Inc.*, 40 Ill.App.2d 117, 189 N.E.2d 382, 385 (1963), an individual proprietor transferred all of its assets to a corporation in exchange for a majority of stock. The court held that the rule of assumption of liability was applicable regardless of whether the business was originally conducted by an individual or a corporation. *Id.* Other state courts that have addressed this issue have found that the composition of the prior business entity has no

bearing on the application of corporate liability laws. Additionally, policy considerations alone militate against allowing an individual to escape liability by incorporating.

*Id.* (parallel citation and footnote omitted) (citing *Soo Line R. Co. v. B.J. Carney & Co.*, 797 F.Supp. 1472, 1483 (D.Minn.1992) (rejecting argument that corporate successor liability "only applies between corporations, and not between a corporation and a business entity of a different form"); *Tift v. Forage King Indus., Inc.*, 108 Wis.2d 72, 322 N.W.2d 14 (1982) (finding "irrelevant that the predecessor business organization was a sole proprietor rather than a corporation"); *Rawlings v. D.M. Oliver, Inc.*, 97 Cal.App.3d 890, 159 Cal.Rptr. 119, 124 (Cal.Ct.App.1979) (finding "not conceptually significant" that predecessor manufacturer was sole proprietor rather than corporation)). *But cf. Vernon v. Schuster*, 179 Ill.2d 338, 228 Ill.Dec. 195, 688 N.E.2d 1172, 1176–77 (1997) (rejecting possibility of successor liability based on sole-proprietor-follows-sole-proprietor); *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F.Supp. 740, 766 n. 36 (E.D.Wis.1994) (disapproving of *Tift* holding in dicta); *Elizabeth Gamble*

successor liability was appropriate under two of these alternative prongs.

 First, the bankruptcy court found that after incorporation and when presented by Ashland with demand for payment of the debts Carter incurred as a sole proprietor, Carter Enterprises, Inc., made no effort to deny liability therefor, but instead made at least some payment against that debt with corporate assets. (Tr. at 88–90.) Like the bankruptcy judge, this Court interprets that act as an implicit assumption by the corporation of the liabilities of its predecessor. (Tr. at 137–40.) *See, e.g., In re State Public Bldg. Asbestos Litigation,* 193 W.Va. 119, 454 S.E.2d 413, 425 (1994) (affirming finding of successor liability under "implicit assumption" prong of *Davis* test where transferee corporation merely "acquired all of [transferor]'s assets and continued to manufacture the same products as" transferor). As noted by the bankruptcy court, Appellant produced no contrary evidence.

 Second, based on the evidence, the bankruptcy judge found that Carter Enterprises, Inc., was but a mere continuation of its predecessor, the sole proprietorship. In *Davis,* the court:

did not discuss the factors which could be considered in determining whether a corporation which purchased a portion of another corporation's assets was a mere continuation or reincarnation of the selling corporation. However, the factors that are to be considered are generally set out in 19 Am.Jur.2d *Corporations* § 2711 [1986], as follows:

[T]he mere continuation exception to the rule of nonliability envisions a common identity of directors and stockholders and the existence of only one corporation at the completion of the transfer.

*Jordan v. Ravenswood Aluminum Corp.,* 193 W.Va. 192, 455 S.E.2d 561, 564 (1995).

*Deaconess Home Ass'n v. Turner Const. Co.,* 38 Ohio Misc.2d 17, 526 N.E.2d 1368, 1372

Thus, a court should examine the commonality of ownership between the transferor and transferee entities.

Appellant concedes that the sole stockholder of the corporation is the same individual who was the sole proprietor. (Appellant's Br. at 2.) Appellant introduced no evidence that any part of the sole proprietorship or its assets or liabilities, tangible or intangible, continued on in some form other than as Carter Enterprises, Inc. Appellant introduced no evidence on the nature of the transaction that transferred the assets and liabilities of the sole proprietor to the corporation. Thus, Appellant's claim that Greg Carter merely "operated a *similar* business as a sole proprietor" to that operated by Appellant (Appellant's Br. at 2 (emphasis added)) mischaracterizes the true nature of the relationship: The evidence led the bankruptcy judge, and leads this Court as well, to the conclusion that as a sole proprietor, Greg Carter operated the *same* business that Carter Enterprises, Inc., operates as a corporation.

Appellant cites *Swing v. Taylor and Crate,* 68 W.Va. 621, 70 S.E. 373 (1911), for the proposition that, although the "the facts were slightly different [in *Swing,*] as long as the organization of the corporation did not leave the predecessor unable to pay debts, there would be no successor liability." (Br. of Appellant at 6.) In fact, *Swing* stands for exactly the opposite conclusion, and the *Swing* court based its finding of no successor liability on facts that were entirely distinguishable from the case at bar. Examining what that court saw as "the pivotal question in the case[,] that is, whether or not there is a legal liability upon the Taylor & Crate Company, a corporation, for the debts of Taylor & Crate, partners," 70 S.E. at 375, Justice Williams wrote for the court:

It is urged that the corporation was but a reorganization of the pre-existing part-

(1986) (same).

nership, by those who composed the partnership, and that the former took over all the assets of the latter for no other consideration than the capital stock issued by the corporation, all of which, it is claimed, was issued to the persons who had composed the partnership; that their interests are the same in the corporation that they were in the firm.... *We have no doubt that, if a corporation were organized by the same persons who had previously formed a partnership, and in which organization no other persons were interested, and all the property of the partnership were transferred to the new organization, the corporation would thereby become liable for the debts of the partnership.*

*Id.* (emphasis added). Unlike the facts in the instant case, the *Swing* court went on to find insufficient commonality of ownership and, thus, no successor liability.

### 2. Amount of the Claim

■ The second issue on appeal is whether the bankruptcy judge erred in arriving at the dollar amount in the judgment order. As noted, *supra*, the Court may not set aside the bankruptcy judge's findings of fact on this issue unless those findings are clearly erroneous. Appellant apparently claims that because the bankruptcy judge remarked "I don't have any evidence in this record that would permit me to find a sum certain" (Tr. at 140), a finding of any specific amount would be erroneous, *i.e.*, that Appellee has failed to meet its burden of persuasion. Appellant avers that the bankruptcy court "determined that even though Ashland Specialty had not established the amount of its claim, it was entitled to a judgment for the amount of its proof of claim." (Br. of Appellant at 2–3.)

As discussed, *supra*, the burden of disproving the amount claimed by Appellee has shifted to Appellant. The question, then, becomes whether Appellant produced evidence which, if believed, would refute at least one of the allegations essential to the legal sufficiency of Appellee's claim, *i.e.*, whether Appellant has produced evidence and shown facts tending to defeat Appellee's claim by probative force equal to that of the allegations of the proofs of claim themselves. The bankruptcy judge answered this question in the negative. (Tr. at 141.19 to .20.)

Both parties' accounting evidence is underwhelming. (*See, e.g.*, Tr. at 136 ("I wouldn't pay either of you $10 for your records.").) Some "variation" on accrual accounting was apparently practiced by the parties. It is this variation, coupled with a lack of the most basic accounting records, that complicates the determination of an appropriate valuation of Appellee's claim.

At some point, Appellant (while operating as the predecessor sole proprietorship) allowed its account with Appellee to fall into arrears. Thereafter, Appellant would make payments to Appellee by check in "odd" amounts, *i.e.*, amounts that did not exactly match the balance of either a single or group of unpaid invoices. (Tr. at 52–53.) Pursuant to what it claims as its legal prerogative, Appellee would apply Appellant's payments to the oldest outstanding invoice or invoices, closing out invoices that were paid in full, and applying the remainder, if any, as partial credit on other invoices. Further complicating the issue, some of Appellant's checks were returned for insufficient funds, and there is evidence that on at least one occasion, a check so marked actually cleared, although Appellant claims it was given no credit for the duplicate payment. (Tr. at 106–08.)

Appellee's evidence consists of "open item reports" (Exs. A and C), an accounts receivable (A/R) summary report from a prior computer system (Ex. B), a tape-register summary of Exhibit C (Ex. D), a "History A/R Inquiry" report for each store (Ex. E), and copies of several checks (Ex. F). According to Susan Bridges, Appellee's bookkeeper, Exhibits A and C each consist of three open item reports

(one for each of the three stores) and, in the case of Exhibit C, related invoices. These reports list each outstanding invoice, that is, each invoice that, according to Appellee, remains unpaid, in whole or in part. The total amount of alleged indebtedness represented by these exhibits ranges from $345,502.27 (Ex. D) to $348,542.79 (Ex. A) to $349,338.99 (Ex. E).

Appellant's evidence consists of a single table recording purchases and payments made between Appellant and Appellee for the period of April 1997 through June 1998 (Ex. 1), and some canceled checks (Ex. F). According to the table, Appellant underpaid Appellee $13,183.12 for that period.[5] Appellant also points to several noteworthy defects with Appellee's evidence. For example, both parties acknowledge that the accounting evidence consists almost entirely of summaries, rather than detailed, contemporaneously maintained, individual source documents or even individual ledger entries transcribed from source documents. The evidence was obtained partly from multiple computer systems. The evidence does not seamlessly cover any particular time period. Some invoices are still filed in boxes in no particular order that might render them usable. Appellant refers to a selection of checks (Ex. F) that match credit entries in Appellee's records to the cent, but less $100 or $200, and with no explanation whatsoever of where the missing $100 or $200 went. Finally, as noted, at least one check that was returned NSF and replaced apparently eventually cleared, but Appellant was un-

able to discover if Appellee gave Appellant credit for both amounts.

Like the bankruptcy court, this Court would like to have seen better evidence. Appellee acknowledges that "[w]e will never have an accounting...." (Tr. at 136.) Notwithstanding the paucity of the record, however, this Court has not been left with a "definite and firm conviction" that, based on the record before it, the bankruptcy court committed an error in allowing Appellee's proof of claim in the amount found. Appellee bears the ultimate burden of persuasion only by a preponderance of the evidence. Appellee filed and executed a proof of claim. The bankruptcy judge disregarded Appellant's possibly uncredited replacement check. (Tr. at 141 ("there is such a gap in the records here I can't come to any conclusions as to whether these N–S–F checks that eventually cleared were not credited").) According to the bankruptcy judge, Appellant came forward with no evidence of a valuation more persuasive than the one offered by Appellee. (Tr. at 141.) Even if this Court believed that the bankruptcy judge's $10 valuation of the accounting record was generous, the Court does not believe that the factual findings regarding the appropriate valuation of Appellee's proof of claim were clearly erroneous.

### III. Conclusion

For the foregoing reasons and under the applicable standard, the decision of the bankruptcy judge to hold Carter Enterprises, Inc., responsible for the liabilities of its predecessor was correct. Further-

---

**5.** Appellant claims that Appellant is *owed* $13,183.12 by Ashland. (Br. of Appellant at 4.) Although this does technically reflect the testimony of Appellant's accountant (Tr. at 24), such a conclusion is unsupported by the exhibit upon which that witness was relying. Exhibit 1 can only stand for the proposition that Appellant *underpaid* Appellee $13,183.12, not the other way around.

Furthermore, Appellee's witness testified how and Appellee's "History A/R Inquiry" (Ex. E.) demonstrates the reason why Exhibit 1 and Exhibits A, C, and D do not match: Appellee was applying Appellant's payments

not to current-period invoices, but to older, out-of-period invoices. For example, while Exhibit 1 might tend to show that Appellant overpaid for the merchandise it received from Appellee during the month of February, 1998 ($119,849.67 paid on $116,167.35 purchased), Appellee was actually applying funds received from Appellant during that period to invoice balances accrued as early as October of the previous year. (*See, e.g.,* Ex. E for store #3, at unnumbered page generated on 7/30/98 at 22:41:25 (on 02/06/1998, applying payment to invoice reference number 42295 from 10/30/1997).)

more, this Court cannot say that the valuation of Appellee's proof of claim as found by the bankruptcy judge was clearly erroneous. Accordingly, the February 17, 2000 judgment order of the bankruptcy court is **AFFIRMED.** The Court **ORDERS** that this appeal be dismissed and stricken from the docket of this Court.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.